Enrique **NUNEZ–ESCUDERO,**
Plaintiff–Appellant,

v.

Stephanie Rose **TICE–MENLEY,**
Defendant–Appellee.

No. 94–1524.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1994.

Decided June 26, 1995.

---

Justin Harley Per, Minneapolis, MN, argued (Mary R. Vasaly, on the brief), for appellant.

Willem Frederik van Vliet, Minneapolis, MN, argued (William Dennis Hull, on the brief), for appellee.

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and LOKEN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Enrique Nunez–Escudero appeals from the district court's order denying his petition for the return of his infant son to Mexico pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Dec. 23, 1981, 51 Fed.Reg. 10493, 10498–502, as implemented by the United States in the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610. We reverse the district court's order and remand to the district court for further proceedings.

Enrique Nunez–Escudero, a citizen of Mexico, married Stephanie Rose Tice–Menley, a citizen of the United States, in Mexico on August 10, 1992. The couple has one child, Enrique Nunez–Tice, born July 28, 1993, in Mexico. On September 21, 1993, Tice–Menley left Mexico with her infant son and returned to her parents' home in Cologne, Minnesota. Nunez–Escudero filed this action, alleging that Tice–Menley had wrongfully removed their son from Mexico in violation of the Hague Convention on the Civil Aspects of International Child Abduction. After receiving affidavits and holding a hearing, the district court denied Nunez–Escudero's claim. This appeal followed.[1]

The Convention was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble. Both the United States and Mexico are signatories to the Convention.

Under the Convention, as implemented by the Act, Nunez–Escudero must initially

---

1. The Mexican Ministry of Foreign Affairs submitted an amicus curiae brief in support of Nunez–Escudero's claim that the baby was wrongfully removed from Mexico in violation of the Hague Convention.

prove by a preponderance of the evidence that Tice–Menley removed their son from his "habitual residence." 42 U.S.C. § 11603(e)(1). If Nunez–Escudero meets this burden, Tice–Menley must show by clear and convincing evidence the applicability of one of the exceptions set forth in Articles 13b or 20 of the Convention. 42 U.S.C. § 11603(e)(2).

Two days before the hearing Tice–Menley submitted her affidavit, as well as affidavits from her parents and a psychologist. Without fully detailing all of Tice–Menley's allegations, she stated that Nunez–Escudero physically, sexually and verbally abused her, and that she was "treated as a prisoner" by her husband and father-in-law.

On January 21, 1994, the district court heard counsels' argument. The district court did not decide whether Tice–Menley removed the baby from his habitual residence. Instead, it refused to order the baby's return because Tice–Menley established one of the Article 13b exceptions. Specifically, the court determined that there was a grave risk that the return of the child would expose him to physical and psychological harm and place him in an intolerable situation. *See* Art. 13b, Convention; 42 U.S.C. § 11603(e)(2)(A). The court reasoned: "to a six-month-old child the suggested action would, in fact, be both a physical and a psychological harm to the child." The court explained: "if there's any truth to the potentiality that a six-month-old child would be institutionalized by virtue of this action, that almost goes completely beyond the subject of being an intolerable situation." The next day, the court entered a written order ruling that Tice–Menley established that there is a "grave risk that the return of the child ... would expose him to physical and psychological harm and otherwise place [him] in an intolerable situation." *Nunez–Escudero v. Tice–Menley,* Civil File No. 3–93–835, Order at 1 (D.Minn. Jan. 23, 1994) (citing Art. 13, Convention).

## I.

Nunez–Escudero argues that the district court considered evidence relevant only in a custody determination, not in applying the Convention. He contends that the Article 13b inquiry is limited to determining whether the courts of the child's habitual residence can provide protection to the child. Nunez–Escudero contends that a child can only be exposed to a grave risk of harm under Article 13b if the habitual residence cannot protect the child. Nunez–Escudero attacks the district court's consideration of the psychiatric evidence as inappropriate for the purpose of deciding the applicability of Article 13b.

This court recently confirmed that exceptions to the Convention are to be narrowly construed. *Rydder v. Rydder,* 49 F.3d 369, 372 (8th Cir.1995). We acknowledged that the Convention prohibits a court from adjudicating the merits of an underlying custody dispute, and that the Convention's primary purpose is to restore the status quo and deter parents from crossing international borders in search of a more sympathetic court. *Id.* (citing *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993)) (Convention and Act grant courts jurisdiction to determine the merits of the abduction claim, but not the merits of the underlying custody issue). In *Rydder,* the mother attempted to establish the applicability of Article 13b by relying on written authorities recognizing the harm of separating a child from his primary caretaker. *Id.* at 373. We concluded this general evidence could not satisfy Article 13b, emphasizing there must be "specific evidence of potential harm." *Id.*

■ Tice–Menley offered some general evidence that the baby could be subject to a grave risk of physical or psychological harm or be placed in an intolerable situation in Mexico. She submitted an affidavit that she was physically, sexually, and verbally abused by her husband. She was not allowed to leave the family home without her husband or father-in-law. She also stated that she feared for her baby's safety. She stated that her husband and his family objected to her nursing the baby and that her husband refused to acquire a baby safety seat for the car. Tice–Menley also detailed accounts of her father-in-law's verbal abuse, and stated that she had seen her father-in-law hit his youngest son with a wooden plunger.

Although this evidence is more specific than that offered in *Rydder*, the evidence suffers from the same shortcoming. The evidence is general and concerns the problems between Tice–Menley, her husband and father-in-law. The district court based its order on the baby's age, the impact of separating the baby from his mother, and the possibility that the baby could be institutionalized during the pendency of the Mexican custody proceedings. Although Tice–Menley's counsel referred to the possibility of institutionalization in argument, Tice–Menley did not offer any such evidence.[2]

The district court incorrectly factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation. Art. 13b, Convention; 42 U.S.C. § 11603(e)(2)(A). After examining the text of the Convention and cases from a range of other countries, the Supreme Court of Canada concluded that only severe potential harm to the child will trigger this Article 13b exception:

> In brief, although the word "grave" modifies "risk" and not "harm," this must be read in conjunction with the clause "*or otherwise* place the child in an intolerable situation." The use of the word "otherwise" points inescapably to the conclusion that the physical or psychological harm contemplated by the first clause of art. 13(b) is harm to a degree that also amounts to an intolerable situation.

*Thomson v. Thomson,* 119 D.L.R.4th 253, 286 (Can.1994). *See also In re A. (A Minor),* [1988] 1 F.L.R. 365, 372 (Eng.C.A.) (abducting parent must prove grave risk of harm that is "something greater than would normally be expected on taking a child away from one parent and passing him to another"). We should give considerable weight to these well-reasoned opinions of other Convention signatories. *See Air France v. Saks,* 470 U.S. 392, 403, 105 S.Ct. 1338, 1344, 84 L.Ed.2d 289 (1985); 42 U.S.C.

§ 11601(b)(3)(B) (recognizing "the need for uniform international interpretation of the Convention").

Moreover, most of the evidence Tice–Menley presented at the first hearing was irrelevant to the Article 13b inquiry. The Article 13b inquiry does not include an adjudication of the underlying custody dispute, *Rydder,* 49 F.3d at 372, and only requires an assessment of whether the child will face immediate and substantial risk of an intolerable situation if he is returned to Mexico pending final determination of his parents' custody dispute. It is not relevant to this Convention exception who is the better parent in the long run, or whether Tice–Menley had good reason to leave her home in Mexico and terminate her marriage to Nunez–Escudero, or whether Tice–Menley will suffer if the child she abducted is returned to Mexico.

We reject Nunez–Escudero's argument, however, that the Article 13b "intolerable situation" exception applies only if the government agencies and courts of Mexico are unable to protect the child if he is returned to that country. "[I]t is clear that Article 13b requires more than a cursory evaluation of the home jurisdiction's civil stability and the availability there of a tribunal to hear the custody complaint. If that were all that were required, the drafters of the Convention could have found a clear, more direct way of saying so." *Tahan v. Duquette,* 259 N.J.Super. 328, 613 A.2d 486, 489 (Ct.App. Div.1992).

▪ Because Article 13 provides that the court "shall take into account the information relating to the social background of the child," it has been held that the court may consider the environment in which the child will reside upon returning to the home country. *See, e.g., Currier v. Currier,* 845 F.Supp. 916, 923 (D.N.H.1994) (in determining grave risk, Article 13 requires the court to evaluate the surroundings to which the child is to be sent and basic personal qualities of those located there); *In re Coffield,* 96 Ohio App.3d 52, 644 N.E.2d 662, 665 (1994) (Article 13 allows the court to consider "the

---

**2.** The Mexican law and Mexican Ministry of Foreign Affairs could perhaps shed light on the fate of the baby should he be returned to Mexico.

*See* Art. 7(e) and (g), Convention; 42 U.S.C. § 11605.

basic environment" of the home country and "the basic nature" of the individuals with whom child would live). To ensure that the child is adequately protected, the Article 13b inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence.

For these reasons, we cannot conclude that psychological reports are *per se* irrelevant. In *Tahan*, the New Jersey Court acknowledged that, in general, psychological profiles and evidence about parental fitness, lifestyles, and relationships were irrelevant to the Article 13b inquiry. 613 A.2d at 489. The evidence offered in *Tahan*, however, differs from that in this case. There, the proffered testimony consisted of evidence about family and school relationships, and the impact of moving the child from the United States to Canada. *Id.* at 488. The court did not say that psychological evaluations can never be considered. Indeed, the court stated just the opposite:

> To hold, as the trial court did, that the proper scope of inquiry precludes any focus on the people involved is, in our view, too narrow and mechanical. Without engaging in an exploration of psychological make-ups, ultimate determinations of parenting qualities, or the impact of life experiences, a court in the petitioned jurisdiction, in order to determine whether a realistic basis exists for apprehensions concerning the child's physical safety or mental well-being, must be empowered to evaluate the surroundings to which the child is to be sent and the basic personal qualities of those located there.

*Id.* at 489.

Thus, we remand this case for further proceedings.[3] We instruct the court not to consider evidence relevant to custody or the best interests of the child. On remand, Tice–Menley must present clear and convincing

evidence that the return of the child to Mexico would subject him to a grave risk of harm or otherwise place him in an intolerable situation if she is to prevail.[4]

## II.

Tice–Menley argues that this court can affirm the judgment because the baby was not a habitual resident of Mexico, and therefore, the Convention does not apply. Tice–Menley argues that she had no intention of remaining in Mexico and had no choice in living there because her husband and father-in-law made her a virtual prisoner. Tice–Menley argues that she, as well as the baby, lost the fundamental right of freedom of movement, and neither of them had a voluntary habitual residence in Mexico. She argues that a six-week old nursing infant cannot make a determination of its own "habitual residence," but is dependent for that determination on its mother. Tice–Menley argues that her son's birth and short stay in Mexico does not establish habitual residence there, and compares her baby's situation to that of a baby born to a woman while vacationing in Mexico. She contends that no marital domicile exists under Mexican law, and consequently, the Mexican courts have no jurisdiction for determining dissolution or custody issues. She cites several Mexican cases which state that a woman coerced to live in a certain place does not acquire a marital domicile, and that a couple living with their parents cannot establish a marital domicile.

This court also considered the question of habitual residence in *Rydder*, 49 F.3d at 373. In that case, the two children were born in and registered as residents of Sweden. *Id.* at 371–72. The children moved to Poland when their father was transferred there under a two-year employment contract. The family intended to remain in Poland for the

---

3. The attorney for Nunez–Escudero admitted at oral argument before this court that the Convention requires only the immediate return of the child to the country of his habitual residence and does not specify the logistics of the return. The attorney suggested that the court could order the child's return to Mexico with Tice–Menley, and subject to the assistance of Mexican or United States authorities.

4. Nunez–Escudero also argues that the district court violated the local discovery rules by considering the late submissions by Tice–Menley. In light of our remand for further proceedings, this argument is moot.

duration of the father's contract. *Id.* at 372. After the mother brought the children to Iowa, the father sought their return under the Convention. *Id.* This court affirmed the district court's finding that the children were habitual residents of Poland, rejecting the significance of the Swedish residence registration and recognizing that "there is no real distinction between habitual and ordinary residence." *Id.* at 373.

The Sixth Circuit reached the same conclusion in *Friedrich*, 983 F.2d at 1401–02. In that case, the mother argued that she did not wrongfully remove her son from Germany to the United States because he did not habitually reside in Germany. *Id.* at 1401. Despite that the son had lived with his parents in Germany for two years, the mother argued the son was a habitual resident of the United States because: (1) he had United States citizenship; (2) the United States was listed as his permanent address for the purpose of documentation; and (3) she intended to return to the United States with her son when she was discharged from the army. *Id.*

The Sixth Circuit rejected the mother's argument, explaining "[a] person can only have one habitual residence." *Id.* The court stated that "[t]o determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions." *Id.* Because the child was born in Germany and lived there exclusively, the court concluded that the child was a habitual resident of Germany. *Id.* at 1402. The court explained: "habitual residence can be 'altered' only by a change in geography and the passage of time, not by changes in parental affection and responsibility." *Id.*

Citing *In re Ponath*, 829 F.Supp. 363, 367–68 (D.Utah 1993), Tice–Menley argues that an infant's habitual residence follows that of

his mother, and that "coerced" residence cannot be habitual residence under the Convention. In *Ponath*, the court recognized that "[a]lthough it is the habitual residence of the child that must be determined, the desires and actions of the parents cannot be ignored ... in making that determination when the child was at the time of removal or retention an infant." *Id.* at 367. Acknowledging that "[t]he concept of habitual residence must ... entail some element of voluntariness and purposeful design," *id.*, the court held that the father's coercion of the mother to stay in Germany "by means of verbal, emotional and physical abuse removed any element of choice and settled purpose" in remaining in Germany. *Id.* at 368.

■ In *Ponath*, however, the child was born and lived in the United States before visiting Germany where his father forced the family to remain. *Id.* at 366. In contrast, here, the baby was born and lived only in Mexico until his mother fled to the United States. To say that the child's habitual residence derived from his mother would be inconsistent with the Convention, for it would reward an abducting parent and create an impermissible presumption that the child's habitual residence is wherever the mother happens to be. *See Friedrich*, 983 F.2d at 1402.

Accordingly, we cannot affirm the district court's ruling on the alternative ground that Nunez–Escudero failed to establish Mexico as the child's habitual residence. Nevertheless, on the record before us, we believe that the district court should first make the determination of habitual residence. If the parties wish to further litigate this issue on remand, they are free to do so.[5]

---

**5.** Article 11 of the Convention requires that courts "act expeditiously in proceedings for the return of children," and it contemplates that decisions will normally be reached within six weeks from the date of commencement of those proceedings. This action was commenced in December 1993, over eighteen months ago. To meet our country's treaty commitment, which was entered into to discourage child abductions and thereby to benefit children of all signatory nations, it is now essential that the parties and

the district court expedite the final determination of this dispute. At oral argument Tice–Menley presented us with a divorce decree and award of custody from the Minnesota state court. We point out that neither the second paragraph of Article 12 of the Convention nor any intervening custody order of a Minnesota state court prevents the implementation of an otherwise appropriate order to return the child to Mexico pursuant to the Convention.

We reverse and remand for further proceedings consistent with this opinion.