No. 83,895

ELIZABETH GERALDINE DALMASSO, *Appellant*, v.
JEAN-LUC DALMASSO, *Appellee*.

.(9 P.3d 551)

Opinion filed July 14, 2000.

*Frank D. Taff,* of Topeka, argued the cause and was on the brief for appellant.

*Allan A. Hazlett,* of Allan A. Hazlett, P.A., of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This appeal raises issues under the Hague Convention on the Civil Aspects of International Child Abduction (the Convention), 51 Fed. Reg. 10498 *et seq.,* and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.* (1994). Elizabeth Dalmasso appeals from an order granting her husband, Jean-Luc Dalmasso, the return of the couple's three sons to France plus attorney fees and transportation costs pursuant to the Convention and ICARA.

*Procedural and factual background*

The trial court's memorandum decision sets forth findings of fact describing the marriage, the birth of the children involved in these

proceedings, and the history of this litigation in the following manner:

"Elizabeth Geraldine Dalmasso and Jean-Luc Dalmasso were married February 2, 1991 in Kansas City, Missouri. Mrs. Dalmasso was born in Chicago, Illinois. Mr. Dalmasso is a citizen of France. The couple met in 1989 when Mr. Dalmasso was teaching at Kansas State University. In August, 1991, the Dalmassos moved to France.

"Mr. and Mrs. Dalmasso have four children. Gabriel Louis Marie was born May 22, 1992 in France. Dominique Bernard Joachim was born November 8, 1993 in France. Joseph Jean-Marie was born January 7, 1995 in Canada. Anne Sophie was born June 20, 1997 in France.

"Prior to January 12, 1999, the children resided with their parents in France, Canada and the United States. Anne Sophie, now two years old, has always resided in France. She is currently living in France with Mr. Dalmasso. The Dalmasso boys have been living with their mother in St. Marys, Kansas, since January 12, 1999. From March, 1996 through early January, 1999, the boys lived with Mr. and Mrs. Dalmasso in France. Gabriel and Dominique resided with their parents in Quebec, Canada, from September, 1994, through July, 1995. Joseph resided in Canada from his birth until July, 1995. From July, 1995, until March, 1996, the boys lived with their parents in St. Marys, Kansas.

"On January 11, 1999, Mrs. Dalmasso left France with Gabriel, Dominique and Joseph. Mrs. Dalmasso explained why she departed France with her sons. She was dissatisfied with her marriage. She said Mr. Dalmasso had neglected her, refused to share the same bed, had obsessive relationships with men, threatened to commit suicide, threatened her life and had struck her in front of the children.

"In November, 1998, Mr. Dalmasso had threatened suicide.' He told Mrs. Dalmasso if she left him he would kill himself. During the Christmas holidays, Mrs. Dalmasso described her husband's mood as depressed. The parties argued over the children's passports. Mrs. Dalmasso said that Mr. Dalmasso swallowed several Prozac pills in front of his mother, Mrs. Dalmasso and two-year old Anne Sophie. Mr. Dalmasso was hospitalized January 2 and released the next morning.

"Mrs. Dalmasso testified she could not handle the stress. She felt that Mr. Dalmasso's parents did not support her. They blamed her for Mr. Dalmasso's suicide attempt. Mrs. Dalmasso did not feel safe staying in France. She sought advice from her family in the United States and from United States Embassy representatives. Mrs. Dalmasso decided she would leave France after being told that if her husband started legal procedures in France, she would never be able to leave France with the children. Mrs. Dalmasso, with the assistance of the United States Embassy personnel, returned to her family in St. Marys, Kansas, on January 12, 1999.

"Mr. Dalmasso also described marital dissatisfaction. He said that Mrs. Dalmasso had suffered depression and had been traumatized in her childhood from a dysfunctional relationship with her mentally ill father. He denied that his taking

of Prozac was a serious suicide attempt. He downplayed the incident as a stupid mistake.

"After Mrs. Dalmasso left France with the boys, Mr. Dalmasso commenced legal proceedings in the courts of Dinan, France. On January 29, 1999, the French Court entered a Provisional Order declaring that Gabriel, Dominique, Joseph and Anne Sophie should reside with Mr. Dalmasso. An authenticated copy of the Order with translation has been provided to this Court.

"On April 12, 1999, Mrs. Dalmasso filed a Petition for Divorce in Shawnee County, Kansas. She sought temporary orders for custody of her children. A hearing on the temporary orders was scheduled in the Shawnee County, Kansas, District Court on May 7, 1999. On May 6, 1999, however, Mr. Dalmasso transmitted by facsimile a hand-written Petition informing this Court that he had made application for return of his children under the Hague Convention and apprising the Court of the proceeding initiated in France. By May 6, the Court had already been notified by the United States Department of State that Mr. Dalmasso had applied for return of the children under the Hague Convention.

"On May 7, 1999, at this Court's Temporary Orders Docket, the Court declined to enter an Order of Temporary Custody in favor of Mrs. Dalmasso. The Court scheduled a telephone status conference between the parties, Mr. Taff [Mrs. Dalmasso's counsel], and Mr. Dalmasso's French counsel, Yves DeMorhery. The telephone conference was held on May 12, 1999. During the conference, the parties stipulated that Mr. Dalmasso was exercising custody rights when the children left France with their mother. It was further stipulated that the recitation of the children's residences in the Petition for Divorce was accurate. Mrs. Dalmasso, however, claimed that the children had not been wrongfully removed from France and that exceptions existed for denial of Mr. Dalmasso's Petition for Return of the Children.

"A hearing was scheduled but subsequently continued by the Court to permit Mr. Dalmasso time to obtain local counsel. Mr. Polier, who replaced Mr. De-Morhery as Mr. Dalmasso's French counsel, arranged for the retention of Allen Hazlett who entered his appearance on Mr. Dalmasso's behalf. Mr. Hazlett filed a formal Petition for Return of the Children to Mr. Dalmasso, Declaration Establishing the Habitual Residence of the Children and submitted several other documents including the affidavit of Mr. Polier explaining French law. During the pendency of this proceeding, Mr. Dalmasso also submitted other documents, including medical certificates and letters of reference. Mr. Hazlett also filed a Motion and Brief in Support of Summary Judgment on Mr. Dalmasso's behalf."

Local counsel for both sides were present at the hearing on Jean-Luc's petition, as were Elizabeth in person and Jean-Luc and his French counsel by telephone from France. At that hearing, the court stated that it had reviewed the file and subsequent filings and was prepared to rule preliminarily based on the stipulations in

the record that the children's habitual residence was in France; Jean-Luc had and was exercising custody rights at the time Elizabeth removed the children; and the evidence showed a wrongful removal, although the court was willing to hear any further argument or evidence on the question of wrongful removal before making a final determination on that issue. Otherwise, the primary purpose of the August 1999 hearing would be to determine if Elizabeth could establish by clear and convincing evidence an exception to the requirement of returning the children. Testimony was given by Elizabeth and Jean-Luc and exhibits were introduced.

Later, it its memorandum decision, the trial court concluded: France was the appropriate forum state for determination of custody issues; Jean-Luc had shown by a preponderance of the evidence that Elizabeth had wrongfully removed the children; and Elizabeth failed to establish by clear and convincing evidence that return of the children to France would subject them to grave risk of physical or psychological harm or that their return should not be permitted under fundamental principles of human rights and fundamental freedoms. The court ordered Elizabeth to return the children to France; ordered Jean-Luc to advance the expenses of transporting the children back to France, with Elizabeth to reimburse him; and ordered Elizabeth to pay Jean-Luc's attorney fees and expenses as well as the costs of the action.

Elizabeth appeals. Our jurisdiction is pursuant to K.S.A. 20-3018(c).

*The Convention and ICARA*

Both France and the United States are signatories to the Convention. ICARA was enacted to implement the Convention in the United States. We have recently considered similar issues to those raised herein in *Sampson v. Sampson*, 267 Kan. 175, 176, 975 P.2d 1211 (1999). As explained in *Sampson*, the Convention and ICARA provide for the return of children wrongfully removed or retained from their habitual residence within the meaning of the Convention. 267 Kan. at 177.

Elizabeth contests the finding that she wrongfully removed the children from their "habitual residence," which is the child's usual

or customary residence prior to the removal. Wrongful removal or retention was identified in *Sampson* as existing when

" '*a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

" '*b* at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

" 'The rights of custody mentioned in sub-paragraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.' Convention, Art. 3, Fed. Reg. at 10498." 267 Kan. at 178.

The petitioner seeking return of a child must prove by a preponderance of the evidence that the removal was wrongful. 42 U.S.C. § 11603(e)(1)(A) (1994). "That is, the evidence must show he or she was exercising lawful custody rights over the child at the time of removal." 267 Kan. at 179. The question of whether lawful custody rights were being exercised at the time of the removal must be determined under the law of the child's habitual residence. Convention, Art. 3(a), 51 Fed. Reg. at 10498; *Freier v. Freier*, 969 F.Supp. 436, 441 (E.D. Mich. 1996).

If the petitioner establishes a wrongful removal, the burden shifts to the respondent to show an exception to the Convention applies. Two such exceptions are (1) that there is a "grave risk" that return of the child would expose the child to physical or psychological harm or would otherwise place the child in an intolerable situation, and (2) that return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Convention, Arts. 13(b), 20, 51 Fed. Reg. at 10499-10500. Pursuant to ICARA, the respondent must prove these exceptions by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

*Standards of review*

Where findings of fact and conclusions of law have been made by the trial court, our function is to determine if the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of

law. Substantial evidence is evidence which possesses both relevance and substance so as to form a basis of fact from which the issues can be reasonably resolved. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993).

The trial court herein made a negative finding that Elizabeth failed in her burden of proof on the issue of "risk of harm." We have said that "a negative finding that a party did not carry its requisite burden of proof will not be disturbed on appeal absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice." *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 275, 864 P.2d 1148 (1993).

With this background in mind, we turn to the issues raised on appeal.

*Wrongful removal*

Elizabeth's first argument is that Jean-Luc failed to show by a preponderance of the evidence that her removal of the three children from France to the United States was a wrongful removal within the meaning of the Convention.

The parties stipulated that Jean-Luc was exercising custody rights when Elizabeth left France. The court noted that, except for roughly 19 months when the children lived in Canada or the United States, the two older children had resided in France and, further, that the three older children had been residing with their parents in France for at least the 33 months preceding their removal by Elizabeth. Based on this evidence, the court's finding that Elizabeth had wrongfully removed the children from their habitual residence was clearly supported by the evidence.

Elizabeth's argument that the United States became the children's habitual residence once she removed them to this country ignores the fundamental purpose of the Convention and the meaning of habitual residence.

Elizabeth's assertion that the French provisional custody order did not establish that a wrongful removal occurred fails to recognize that the trial court never so found. In light of the stipulations

and undisputed facts, the trial court's ruling on this issue is correct irrespective of any consideration of the French custody order.

Elizabeth's further assertion that she had as much right to take the boys to the United States as Jean-Luc did to take Anne Sophie back to Brittany in Northwestern France where the family's home was located and where Jean-Luc was employed ignores the facts and the law. Further, her contention that the trial court impermissibly shifted the burden of proof to her on this issue is not supported by the record. The appropriate standard and burden of proof was employed.

Finally, the argument that this issue was based on inadmissible hearsay is also not supported by the record. The wrongful removal ruling was largely based on stipulations of the parties and undisputed direct evidence. The trial court's finding of wrongful removal by Elizabeth must be affirmed.

*The grave risk exception to return of the children*

Elizabeth next asserts that contrary to the trial court's ruling, she established by clear and convincing evidence that "there is a grave risk that [the children's] return would expose the child[ren] to physical or psychological harm or otherwise place [them] in an intolerable situation." Convention, Art. 13(b), 51 Fed. Reg. at 10499.

This contention fails principally because of our standard for reviewing the trial court's negative finding that Elizabeth failed to carry the requisite burden of proof. The standard for reviewing a negative finding was previously set forth. The trial court's specific findings on this issue were set forth in its well-reasoned memorandum decision as follows:

"Once the petitioning party meets the burden of proof as to wrongful removal, the burden shifts to the other party to show by clear and convincing evidence that an exception to the Convention exists. 42 U.S.C. § 11603(e)(2). In this regard, Mrs. Dalmasso contends that return of the children would expose them to physical or psychological harm and that return of the children would not be permitted under fundamental principles relating to the protection of human rights and fundamental freedoms. [The latter ground appears to have been abandoned on appeal, and, in any event, was an argument without merit in this case.] Despite a showing of

wrongful removal, the Court is not bound to order the children's return if there are extenuating circumstances that present a grave risk of harm to the children.

"Mrs. Dalmasso expressed concerns about the safety of the three children. She said Mr. Dalmasso had threatened and attempted suicide, and has been abusive toward her and the children. Because of these factors, Mrs. Dalmasso believed it is 'possible' that Mr. Dalmasso would be a danger to the children.

"The evidence presented by Mrs. Dalmasso does not establish any serious risk that Mr. Dalmasso or anyone associated with him would jeopardize the children's welfare or place them in grave risk of physical or psychological harm. There is no evidence that Mr. Dalmasso has ever neglected or failed his children or placed them in actual danger. Mrs. Dalmasso said that Mr. Dalmasso struck the children with a belt. Mr. Dalmasso explained that he did in fact use corporal punishment as did Mrs. Dalmasso.

"Nothing presented even remotely tends to establish, by clear and convincing evidence, that the children's social background in France presents a grave risk of either physical or psychological harm. It is noted that Mr. Dalmasso continues to care for his two-year old daughter. In addition, the Court has considered documents and information submitted in support of Mr. Dalmasso's Petition. A medical certificate filed by Dr. Cordier reflects an examination that showed no signs of any psychological or psychiatric abnormality of Mr. Dalmasso. Mrs. Dalmasso has failed to persuade the Court that return of the children to France would place them at risk of harm."

In addition to the standard for reviewing negative findings, some general principles relating to the Convention and ICARA guide our review of this issue. In considering the exceptions of Article 13, the trial court should take into account any information relating to the child's social background provided by the "Central Authority or other competent authority of the child's habitual residence." Convention, Art. 13, 51 Fed. Reg. at 10499. Although the surroundings to which the child will be returned and the personal qualities of the people located there are relevant to the inquiry of whether a child will be exposed to a grave risk of harm, the Article 13(b) exception was not intended to be used as a vehicle to litigate the child's best interests and must be narrowly construed. See Hague International Child Abduction Convention, Text and Legal Analysis (Legal Analysis) III(I)(2)(a), (c), 51 Fed. Reg. 10494, 10509-10510. Elisa Perez-Vera's Explanatory Report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of its provisions. See Legal Analysis, 51 Fed. Reg. at 10503. As stated in

the Perez-Vera Report, ¶ 34, the exceptions to return of the child are "above all . . . to be interpreted in a restrictive fashion if the Convention is not to become a dead letter." The person opposing the child's return must show the risk to the child is grave and not merely serious. Legal Analysis, III (I)(2)(c), 51 Fed. Reg. at 10510.

In *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995), the court, quoting a decision by the Supreme Court of Canada in *Thomson v. Thomson*, 119 D.L.R.4th 253, 286 (Can. 1994), concluded that although the word "grave" modifies "risk" and not "harm," this language

" 'must be read in conjunction with the clause "or otherwise place the child in an intolerable situation." The use of the word "otherwise" points inescapably to the conclusion that the physical or psychological harm contemplated by the first clause of art. 13(b) is harm to a degree that also amounts to an intolerable situation.' "

Elizabeth first asserts that she proved this exception by showing Jean-Luc's violent behavior and his threats and attempts at suicide. Jean-Luc contends none of the evidence presented by Elizabeth rises to the level required by Article 13. We agree.

Elizabeth cites two cases, *Steffen F. v. Severina P.*, 966 F. Supp. 922 (D. Ariz. 1997), and *Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456 (D. Md. 1999), to support her argument. While both cases did result in rulings denying return of the child, they are clearly factually different from the situation we face and do not require the result Elizabeth desires.

Elizabeth did not show regularly inflicted abuse but rather described two distinct incidents of physical violence towards herself: an incident in 1997 when Jean-Luc hit her and pulled her hair during an argument and an incident in December 1998 when he hit and kicked her backside during a holiday train trip. The only evidence of acts by Jean-Luc against the children was Elizabeth's testimony that he struck them with a belt during meals, apparently because Jean-Luc did not want them speaking during meals. The trial court noted there was evidence that Elizabeth had also used corporal punishment on the children.

Elizabeth has not shown either a factual or legal basis for the reversal of the trial court. There was substantial evidence to sup-

port the trial court's findings of fact and legal conclusions and the court did not arbitrarily disregard undisputed evidence or show prejudice in rendering its negative finding on Elizabeth's claim of risk to the children. The narrow interpretation required for Article 13(b) exceptions was properly utilized. We must affirm the trial court's rulings on this issue in all respects.

*Hearsay evidence and the trial court's consideration of documents not formally received into evidence at the hearing on Jean-Luc's petition*

Elizabeth next asserts the trial court committed reversible error in relying on hearsay evidence and documents not formally received in evidence at the hearing on Jean-Luc's petition.

The claims relating to the wrongful removal issue were not based on hearsay despite Elizabeth's claims to the contrary because the trial court largely relied on stipulated facts. We therefore focus on Elizabeth's hearsay claims relating to the "risk of harm" issue.

Elizabeth first complains that the trial court relied in its memorandum decision on an affidavit of Jonathon Polier describing French divorce law. The information described in the affidavit is readily available by resort to texts on the same issue (see Pollard, Sourcebook on French Law, pp. 305-366 [2d ed. 1998]), and the affidavit was only considered by the trial court on the issue that was abandoned by Elizabeth on appeal (the question of whether returning the children should be prohibited under principles of fundamental freedom and human rights). In short, the Polier affidavit is of no moment for purposes of this appeal.

Elizabeth's complaint that the trial court improperly relied on medical certificates relating to Jean-Luc and letters of reference that he supplied must be considered despite Jean-Luc's claim that she did not make a proper objection. The record reflects an objection by Elizabeth's counsel to the trial court's ruling that there could be no valid objection on the basis of hearsay under the Convention.

Elizabeth's reliance on 42 U.S.C. § 11604 (1994) is misplaced, as that provision only relates to provisional orders for protecting the child and for preventing his or her removal or concealment

pending final determination of a petition and is simply not applicable to our facts. Likewise, Jean-Luc's reliance on 42 U.S.C. § 11605 (1994) is also misplaced as it relates to the dispensing of certain authentication requirements for documents relating to the petition or application and does not govern Elizabeth's hearsay concerns.

Under the Convention,

"[a]ny application submitted to the Central Authorities or directly to the judicial or administrative authorities of a Contracting State in accordance with the terms of this Convention, *together with documents and any other information appended thereto or provided by a Central Authority*, shall be admissible in the courts or administrative authorities of the Contracting States." (Emphasis added.) Convention, Art. 30, 51 Fed. Reg. at 10501.

This provision was intended to resolve the problem which existed in some member states regarding the admissibility of documents; it seeks to facilitate the admission of applications and documents attached thereto and submitted either directly to judicial or administrative authorities or through the Central Authorities. Perez-Vera Report, ¶ 140. Under this provision, hearsay concerns would be dispensed with for items appended to the Hague petition or provided by the Central Authority because Article 30 makes such items admissible without qualification in the courts of the Contracting States. See *In re Walsh*, 31 F. Supp. 2d 200, 202 n. 1 (D. Mass. 1998) (acknowledging the hearsay nature of one of petitioner's affidavits but considering it as evidence anyway as required by the Convention because it was among the materials attached to the petition).

In this case, however, the documents in issue were not attached to the petition but appear to have been provided later and, in some instances, at the request of the trial court.

The language of a statute should be interpreted to avoid absurd or unreasonable results. *State v. Le*, 260 Kan. 845, Syl. ¶ 4, 926 P.2d 638 (1996). Such a rule should likewise apply to the interpretation of the Convention. It seems illogical that if attached to the petition or provided by a central authority, documents are admissible, while, if provided later, they are not. Article 30 was intended to give deciding courts and administrative agencies access to rele-

vant evidence despite the barriers of time, expense, and geography which might otherwise make it impracticable or unduly expensive in international disputes for such evidence to be gathered and presented in the face of hearsay or other evidentiary concerns.

A flexible and sensible interpretation of Article 30 should be adopted allowing trial judges to consider any document offered in support of a Hague petition, whether affixed to the petition or not, with any hearsay concerns to be considered by the trial court mainly in deciding the weight and credibility which the documents warrant.

We note in this case that the hearsay documents relevant to the "risk of harm" issue were in addition to direct testimony received from both sides. One of the hearsay documents was a letter from the principal of Jean-Luc's school which spoke of his qualifications as a teacher, his passage of regular school medical assessments, and his fitness to teach and work with children. The second item was a letter from Jean-Luc's priest vouching in rather summary terms for Jean-Luc's parenting skills. The final relevant hearsay item was the medical certificate from a Dr. Cordier who had examined Jean-Luc on June 2, 1999, and stated that Jean-Luc showed no signs of psychological or psychiatric abnormality.

The trial court's decision does not appear to have been particularly dependent on the content of the above documents, and the trial court only referred to them in its memorandum decision after reaching its primary conclusion that Elizabeth had not established by clear and convincing evidence the "grave risk" to the children required by Article 13(b).

Under our facts here it is clear that the substantial rights of the parties were not prejudiced by the trial court's consideration of these documents. Even if we were to view the trial court's consideration of these documents as error, we would consider the error to be harmless. See K.S.A. 60-261.

*Attorney fees, costs, and transportation expenses*

Finally, Elizabeth asserts that Jean-Luc "comes from wealth" and she is poverty stricken and that, for this reason, the trial court

erred in ordering her to pay the costs and fees generally required by 42 U.S.C. § 11607(b)(3) (1994), which states:

"Any court ordering the return of a child pursuant to an action brought under section 11603 [an action under the Convention for return of a child wrongfully removed or retained] of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."

See Convention, Art. 26, 51 Fed. Reg. at 10500 (giving discretion for such an order).

Elizabeth's argument is based on her testimony that Jean-Luc's parents were wealthy and that she never had any money because Jean-Luc never gave her any spending money and she flew back to the United States using a consulate loan.

Although Jean-Luc expressly requested fees and costs pursuant to 42 U.S.C. § 11607 in his petition, Elizabeth never addressed the issue in her trial court brief in which she responded to Jean-Luc's petition or in any other document that is part of the record on appeal, and she never mentioned the issue in her arguments at the August 1999 hearing on Jean-Luc's petition. To defeat a request for fees and costs, Elizabeth had the burden of establishing to the trial court's satisfaction that an order for such fees and costs would be "clearly inappropriate," yet we see no place in the record where she made such an assertion or otherwise contested Jean-Luc's request for fees and costs. She may not raise this issue for the first time on appeal. See *Ripley v. Tolbert*, 260 Kan. 491, Syl. ¶ 6, 921 P.2d 1210 (1996) (issues not raised before the trial court cannot be raised on appeal).

Even if considered, Elizabeth has failed show that the order of costs and expenses was "clearly inappropriate" in this case. The Convention anticipates that all "necessary expenses incurred . . . to secure the child[ren]'s return" will be shifted to the abductor, both "to restore the applicant to the financial position he or she would have been in had there been no removal or retention, as well as to deter such conduct from happening in the first place." See Legal Analysis, III (J)(2), 51 Fed. Reg. at 10511.

The ultimate amounts have yet to be considered by the trial court who remains in control of the actual amounts allowed. The trial court's ruling as to fees, costs, and expenses was not erroneous.

Affirmed.