**Wim DELVOYE, Petitioner,**

v.

**Christina LEE, Respondent.**

**No. CIV. 02–769(FSH).**

United States District Court, D. New Jersey.

Sept. 24, 2002.

Dean G. Yuzek, Joan Walter, Bernard Post, Hutton, Ingram, Yuzek, Gainen Carroll & Bertolotti, New York City, for Petitioner.

Robert W. Avery, Susan M. Lee, Avery & Avery, Ridgefield, NJ, for Respondent.

## OPINION

HOCHBERG, District Judge.

This matter comes before the Court by Wim Delvoye's petition for the return of his son (referred to as "Baby S") to Belgium under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501. Petitioner contends that Baby S was wrongfully removed from Belgium by Christina Lee (Respondent), Petitioner's former girlfriend and the mother of Baby S, and that under the Convention Baby S should be returned to Belgium so that the Belgian courts may adjudicate a custody hearing.

## FACTS

Petitioner and Respondent first met during February or March 2000 when Petitioner was an artist and Respondent was working for an art gallery. Petitioner and Respondent began a romantic relationship shortly thereafter. Petitioner testified that during the months of March and April 2000, he traveled to New York from Belgium approximately five times, solely to see Respondent. During those visits, Petitioner and Respondent stayed in Petitioner's Manhattan apartment. As the relationship progressed, Petitioner and Respondent met a few more times, again staying in Petitioner's apartment in Manhattan, and, on one occasion, meeting in Belgium.

In August 2000, Respondent moved into Petitioner's Manhattan apartment.[1] Petitioner lived mostly in Belgium at the time,

but spent about a quarter of his time in New York. When Respondent moved into the apartment, she brought with her a number of items, including a night table, a kitchen table and chairs, books, a television, clothes, a microwave, shoes, jewelry, kitchenware, and other items.

Respondent learned in late September 2000 that she was pregnant. After a number of discussions regarding the possibility of an abortion—which Petitioner vehemently opposed—the couple decided to carry the baby to term and Respondent began prenatal care in New York City. Petitioner, on at least one occasion, joined Respondent on a visit to her obstetrician in New York.

The original plan was to have the baby in the United States. On or about October 2000, the parties discussed the cost of having a baby in the United States. Petitioner testified that he was told that the cost would be about $20,000 and that he thought this was "really funny" (in the surprising sense). Petitioner testified that a person could "even get money [for giving birth] in Belgium." Both parties testified that Petitioner refused to pay for any of Respondent's medical costs if the baby were carried to term in the United States. Rebecca Sutherland, a graduate student at Harvard University who is a close personal friend of Respondent, was telephoned by Petitioner several times in his effort to get Sutherland to persuade Respondent to travel to Belgium temporarily so as to take advantage of that country's free medical services.

The parties' testimony differs on the purpose of their travel to Belgium. Petitioner testified that he asked Respondent to join him in Belgium since he was settled there, had a large apartment there, and

---

1. Petitioner testified that Respondent was renting the Manhattan apartment from him.

Under cross-examination, however, he stated that she never paid him any rent.

based his artistic career there.[2] Respondent testified that Petitioner adamantly insisted that she join him in Belgium for the term of the pregnancy, threatening not to pay for any medical care if she did not do so. She testified that her decision to travel to Ghent, Belgium was made under duress, as she was afraid about financing the pregnancy and wanted very much to get married. Respondent at all times believed that her travel to Belgium was temporary and she planned to return to the United States as soon after the birth of her baby as she could safely travel. After returning to the United States, Respondent testified, the couple would always keep a Manhattan apartment and would also consider a metropolitan European city as a future second residence. Respondent's testimony was corroborated by Ms. Sutherland, whose testimony was based substantially on direct conversations with Mr. Delvoye. Before the birth, Mr. Delvoye told Ms. Sutherland that Ms. Lee and her baby would spend at least half the year in New York, with the remainder in Europe—either in Belgium, Paris or London.

In November 2000, when Respondent was four months pregnant, she traveled to Belgium on a three-month tourist visa. She brought along only one or two suitcases filled with maternity clothing. Respondent did not remove her belongings from the Manhattan apartment; rather, she left her non-maternity clothes, books, jewelry, shoes, microwave, dishes and furniture in New York.

Petitioner's apartment in Ghent, Belgium consisted of a large loft space where he lived and worked. Sutherland testified that Petitioner's loft could be reached only by scaling several steep flights of stairs, the last flight of which had no railing. (Late in the pregnancy, a railing was installed.) Petitioner and Respondent slept on a mattress on the floor in one part of the loft, which had no closets or dividing walls. The only private room was a bathroom. In the middle of the loft was a long table that Petitioner used for his art work.

Sutherland testified that when she visited Ghent in March 2001, Respondent was still living out of a single suitcase, which was not unpacked. Indeed, during Respondent's entire stay in Belgium, she lived out of her suitcase. Neither Petitioner nor Respondent took any steps to extend Respondent's three-month tourist visa or to obtain any permanent visa. Despite having great difficulties communicating in a region where people spoke mostly Flemish, Respondent never attempted to learn Flemish.

Baby S was born in Belgium on May 14, 2001. The parties' relationship was deteriorating both before and after the birth of their child.[3] Respondent testified that she

2. Petitioner is a recognized contemporary artist in Belgium, whose productive efforts are shown in New York, Belgium and elsewhere.

3. Respondent blames the deteriorating relationship on Petitioner's uncontrollable rage and his increasingly bizarre forms of art, which consisted of replicating human excrement and/or animal or human copulation depicted in x-rays. At the hearing, much of Petitioner's art was introduced into evidence by Respondent in an attempt to lay the foundation for a claim that the return of Baby S to Belgium would pose a grave risk of psychological harm for Baby S. To this end, Respondent introduced pictures of Petitioner's art, including pictures of: an x-ray of Petitioner licking a pig's anus; an x-ray of pigs arranged so as to depict them having sex; x-rays of women performing fellatio; an x-ray of male genitalia beside a woman's breasts; pigs tattooed by Petitioner; and stained glass windows with x-rays ranging from pigs to an x-ray of Petitioner's nephew surrounded by pigs. Pictures were also shown of Petitioner's Cloaca machine, a large machine that is fed regular human food and, twenty four hours later, excretes the biological equivalent of human feces. Evidence was also introduced that Petitioner used pictures taken from sonograms of the baby in his art.

sought to return to the United States earlier than July 23, 2001, but she could not get a United States passport for the baby without Petitioner's consent, which he initially declined to give. During arguments, Petitioner threatened to have Respondent deported without her baby. After continued fighting, Respondent testified, Petitioner finally consented to Respondent's departure with Baby S—instructing her to "[l]eave with the baby now before I get attached."

Petitioner thereupon signed a two-parent consent form needed to obtain a United States passport for Baby S. Petitioner drove Respondent and Baby S to the airport and they returned to the United States.[4] Although Petitioner testified that he only agreed that Respondent could return to the United States with Baby S for a short visit, his behavior at the airport suggests otherwise.[5] Respondent and Baby S moved in with Respondent's mother in Fort Lee, New Jersey.

Petitioner returned to the United States on a number of occasions between July 2001 and January 2002. While the parties disagree on the nature of the trips—whether for business or to visit Respondent and Baby S—it is undisputed that on these trips the parties tried in vain to reconcile. While attempting to reconcile, Petitioner offered to return to the United States and to make a home there.[6] He and Respondent investigated housing options in New York, as his Manhattan apartment was too small for a family. In a letter to Respondent's mother, Petitioner also offered to pay for the child's education in America.

At the hearing, Petitioner acknowledged having repeatedly lied to Respondent in a tactical ploy to win back Respondent's affections. In one letter to Respondent, Petitioner wrote that he had seen a psychiatrist and that he had spent some time in a hospital, implying that he had been treated for his psychological problems and that his psychological condition was much im-

---

Respondent also alleges that Petitioner's interest in contemporary art led Petitioner to examine human excrement in odd ways. According to Respondent, Petitioner was very excited while changing diapers because of his fascination with human excrement. In addition, Respondent alleges that Petitioner, when his sister's infant daughter was being changed, expressed interest in examining the infant's private parts.

Respondent testified that Petitioner also used her in his art work, bringing her to a radiologist two weeks after giving birth to be x-rayed with her vagina filled with barium into which a sexual object had been inserted. When Respondent objected, Petitioner threatened to do the x-ray with another female friend.

Respondent sought to introduce into evidence a psychological report of Petitioner prepared by an expert hired by Respondent. However, the expert was unable to attend the hearing. The proceeding was therefore bifurcated and consideration of the expert's report and expert testimony as to risk of psychological harm were stayed pending resolution of

the issues that would not require expert testimony. Only if those issues were not dispositive would the Court then reach the issue of grave risk of psychological harm.

4. The airline tickets purchased by Respondent were round-trip tickets. Respondent testified that she purchased round-trip tickets because they were discounted fares that were cheaper than one-way fares. Respondent testified that she never intended to use the return ticket. She never did. Respondent's testimony was not refuted on this issue with any evidence to the contrary, nor with any impeachment of Respondent's testimony.

5. Petitioner was extremely emotional, videotaping Respondent and Baby S throughout the airport to keep a memory of the baby. He also requested a piece of the baby's clothing to keep as a remembrance.

6. In a letter from Petitioner to Respondent dated August 14, 2001, Petitioner stated: "I am willing to come and settle with you in New York—if you want that."

proved. At the hearing, however, Petitioner testified that he never saw a psychiatrist and was never in a hospital. Indeed, Petitioner had simply fabricated the statements. Petitioner also testified that he had previously lied to the Belgian authorities by obtaining a letter falsely claiming that he had a mental problem that prevented him from serving in the military.

When the parties were unable to resolve their differences amicably, Petitioner filed a petition seeking the return of Baby S to Belgium under the Convention.

## STANDARD OF REVIEW

The Convention is an international treaty created in an attempt to "protect children ... from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence...." Convention, Preamble. In 1988, Congress passed the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.* (1988), to establish procedures to implement the Convention in the United States. The established procedures are "aimed at maintaining the status quo and deterring parents from crossing international boundaries in search of a more sympathetic court." *Wanninger v. Wanninger*, 850 F.Supp. 78, 80 (D.Mass. 1994) (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.1993)).

Under the Convention, a district court is authorized to adjudicate the merits of a wrongful removal or detention claim, but not the underlying custody dispute. *Friedrich*, 983 F.2d at 1400. The inquiry is therefore limited to whether removal or retention of the child in question was "wrongful" under the Convention. Convention, Arts. 3, 12; *see also Feder v. Evans–Feder*, 63 F.3d 217, 221 (3d Cir. 1995). Petitioner has the burden of proving, by the preponderance of evidence, wrongful removal or retention. 42 U.S.C. § 11603(e)(1)(A). Under Article 3 of the Convention, removal or retention of a child is "wrongful" where: "(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention, Art. 3. Removal or retention under the convention is only wrongful if the child is removed from his or her "habitual residence." *See Friedrich*, 983 F.2d. at 1400. The remedy for wrongful removal or retention is the return of the child. Convention, Art. 12; *Feder*, 63 F.3d at 221.

The general rule of return has four exceptions:

(1) grave risk that return of the child would expose [him] to physical or psychological harm; (2) violation of fundamental principles of the requesting State relating to the protection of human rights and fundamental freedoms; (3) delay more than one year after the child [has] become settled in a new environment; or (4) consent by the petitioner to the removal or retention.

*Wanninger*, 850 F.Supp. at 81. Once Petitioner meets his burden of proving wrongful removal or retention, Respondent has the burden of proving an exception. The first two exceptions must be proved by clear and convincing evidence, while the latter two need only be proved by a preponderance of the evidence. 42 U.S.C. §§ 11603(e)(2)(A) and (B).

## DISCUSSION

Respondent has presented three alternate grounds for denying the petition to return Baby S to Belgium. First, Respon-

dent argues that Petitioner has not proven wrongful removal or retention of Baby S because he has failed to meet his burden of proving by a preponderance of the evidence that Belgium is the habitual residence of Baby S. In the alternative, Respondent argues that Petitioner consented to the baby's removal from Belgium to the United States, thereby putting this matter under the fourth exception to the return of a child to his or her habitual residence. Finally, Respondent argues that return of the infant to Belgium would pose a grave risk of psychological harm to him.

### Habitual Residence

The term "habitual residence" is not defined in the Convention or ICARA. Courts have conducted fact-based analyses that evaluate whether a child's presence in a country is of sufficient duration to have a "degree of settled purpose" from the child's perspective, as well as the parents' shared intentions regarding their child's presence in a country. *Feder*, 63 F.3d at 224. In *Feder*, the Third Circuit explained that:

> [A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective.... [A] determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

*Id.* at 224. In *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir.2001), the court found that "settled intent" regarding habitual residence requires more than a mere intent to change residence. *Id.* at 1075. Rather, there must be some intent to abandon the prior habitual residence. *Id.*

In this Circuit it is clear that the parents' shared intentions regarding the child's presence in a country are considered along with an analysis of the child's circumstances there. *Feder*, 63 F.3d at 224. In the case of a newborn infant who is still nursing, it is particularly appropriate to focus on parental intentions in determining a child's habitual residence. *Cf. In re Ponath*, 829 F.Supp. 363, 367 (D.Utah 1993). A two-month old neonate simply has not been present anywhere long enough to have an acclimatization apart from his parents.

In the present case, the witnesses offer conflicting testimony about their intentions regarding Baby S's habitual residence. Petitioner testified that the couple had decided to move to Belgium indefinitely after they decided that Respondent would carry the baby to term. Respondent testified that they decided to live only temporarily in Belgium for the later months of her pregnancy, and that this decision was made only after Petitioner complained about the high cost of carrying a child to term in the United States and refused to pay any of the medical costs of pregnancy and delivery in the United States. According to Respondent, the temporary move was meant to end shortly after the baby's birth.

Respondent's account of the events is supported by the testimony of Ms. Sutherland, who testified to conversations with both Petitioner and Respondent indicating that the move to Belgium was intended to be temporary. Petitioner himself testified that he wanted Respondent to go to Belgium to avoid the high cost of carrying a child to term in the United States. He also told Ms. Sutherland that Respondent and the baby would thereafter live in the United States for at least six months each year.

In the face of conflicting testimony, this Court must make credibility determinations based on its perception of the parties as witnesses and on the evidence offered to

support or refute the parties' testimony.[7] In observing the witnesses, the Court notes that Petitioner failed to answer many questions directly. Petitioner's credibility is also damaged by the fact that he has admitted lying to Respondent throughout their relationship. For example, Petitioner told Respondent that he had seen a psychiatrist and that he had been to the hospital "for four days, recovering from grief and cleaning up the bad spirits with a good doctor"—statements that Petitioner admits having made but acknowledges were untrue. Petitioner also acknowledges having obtained a false letter about a "made up" psychiatric condition which was given to the Belgian authorities.

Respondent's testimony, by contrast, was not significantly impeached and was corroborated by Ms. Sutherland. Ms. Sutherland offered the most calm, composed and credible testimony of the three witnesses. Neither side impeached Ms. Sutherland's credibility, and testimony was given that both Petitioner and Respondent trusted Ms. Sutherland and sought her help in their attempts to reconcile. This Court therefore finds the testimony offered by Respondent and Ms. Sutherland relating to the habitual residence more credible than the conflicting testimony of Petitioner.

The Court's decision to credit Respondent's testimony that Belgium was not the habitual residence of the neonate is also supported by the substantial weight of the circumstantial evidence. Petitioner owned his New York apartment and invited Respondent to move in there. When she did so, Respondent brought with her furniture and other items that are consistent with moving to a permanent residence. Upon finding out that she was pregnant, Respondent started her prenatal care in New York with a New York doctor. It is undisputed that the primary motivation to have the baby in Belgium was to obtain free medical care and avoid the high cost of carrying a baby to term in the United States. No evidence was presented to indicate that the parties thought that the departure from New York would be permanent. For example, there was no "going-away" party; no sale of the New York apartment; no removal of furniture from the New York apartment; and no removal of Respondent's non-maternity clothing from the New York apartment. *See Kanth v. Kanth*, 79 F.Supp.2d 1317 (D.Utah 1999) (where parties did not sell property in the United States and took no other steps consistent with a permanent move, habitual residence did not change in a move lasting less than one year). The parties applied for only a three-month tourist visa for Respondent and never applied for any visa extension or a permanent visa. Respondent brought nothing more than one or two suitcases filled with maternity clothing to Belgium. While there, Respondent lived out of her suitcases, having never fully unpacked. Respondent did not take classes in Flemish and never sought employment in Belgium. *Cf. Feder*, 63 F.3d at 224 (intent of parents evidenced by purchase of new house and future employment decisions). Petitioner offered no evidence to show that the parties had planned any steps to settle Baby S into life in Belgium.[8] By contrast, Petitioner's correspondence with Respondent's mother, written shortly after Respondent

---

7. The Court makes credibility determinations reluctantly in such a proceeding. *Cf. In re Ponath*, 829 F.Supp. at 366 n. 3 making a credibility determination in a child abduction case.

8. The Court notes that many parents do not take active planning steps for their infant children. However, in examining the circumstances surrounding the parties' stay in Belgium, the Court looked for circumstantial evidence relating to any factor that supports Petitioner's position. No such evidence was presented.

and Baby S returned to the United States, revealed Petitioner's intention to educate the infant in the United States. In short, the parties' intentions and actions do not support the view that Belgium was the habitual residence of Baby S despite his birth and first sixty days of life in that country.[9]

Petitioner argues that the "settled intent" cases do not apply because they all involve situations in which a court had to choose between two different countries in which the child had lived *prior* to the alleged wrongful removal or retention.[10] Here, he argues, the baby was out of the womb exclusively in Belgium for the two months before respondent took him to New York, and therefore his only possible habitual residence is Belgium. While Petitioner cites a number of cases in which a young child was returned to the country in which he or she was born, there are distinguishing factors that, when taken together,

set this case distinctly apart from those cases. Here, Respondent was already pregnant at the time she left the United States and entered Belgium; the parents' intent was for the stay in Belgium to be a temporary money-saving measure; Respondent only remained in Belgium for the latter months of her pregnancy and immediate postpartum period before taking steps to depart; the infant was two months old and nursing at the time he left Belgium with his mother and there were no other older children in question, *cf. Tsarbopoulos v. Tsarbopoulos*, 176 F.Supp.2d 1045 (E.D.Wash.2001) (children were five-years, two-years, and two-months old); and the father drove the mother and baby to the airport after signing a consent to give the baby a U.S. passport. These factors, taken together, set this case apart from the cases relied upon by Petitioner to support his "birth country" theory.[11]

**9.** Once in Belgium, Petitioner may have changed his mind and wanted to make Belgium the family's habitual residence. However, a unilateral decision or change of heart by one party cannot change the settled intent of the parties regarding the habitual residence. *Feder*, 63 F.3d at 225. The settled joint intent of the parties here was to move to Belgium only temporarily.

**10.** During the hearing, Petitioner's counsel somewhat retreated from his position. The Court asked the following:

Court: Well, let me ask you this hypothetically. Are you saying that if [the parties] agreed to go to Belgium to have this baby and [returned to the United States] within a week after being in Belgium, when she was able to travel again and return to the United States, that this baby has to stay in Belgium?

. . . . .

Petitioner's Counsel: ... I'm not prepared to press my point to that degree.... I have considered your honor's hypothetical and I think that could raise other issues.

**11.** Petitioner relies heavily on *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 375 (8th Cir.

1995) to support this theory. In *Nunez–Escudero*, the father and mother resided and wed in Mexico. *Id.* at 375. Approximately eleven months after being wed, the parents had a child, also in Mexico. *Id.* Three months later, the mother took the child to the United States. *Id.* The father appealed, stating that Mexico was the habitual residence. *Id.* The mother argued that she always thought she would return to the United States but was forced to stay in Mexico until she finally left. *Id.* at 378. The mother also argued that an infant cannot have a habitual residence of its own and must therefore follow the mother. The Eighth Circuit rejected the mother's arguments. The court noted that the habitual residence cannot derive solely from the mother's residence, as it would be inconsistent with the Convention. *Id.* at 379. The court distinguished *In re Ponath*, in which a child was returned to the United States after the family temporarily moved to Germany, by explaining that the child in question in *Nunez–Escudero* was always in Mexico.

The holding in *Nunez–Escudero* is not at odds with this Court's view. In this case, the Court's decision regarding the infant's habitual residence is not derived from a conclusion

This Court rejects any bright line rule that a child born in a country is automatically a habitual resident of that country, regardless of all other evidence to the contrary. That is not the analysis mandated by this Circuit in *Feder*. Surely, if a couple lives in the United States and gives birth to a child during a summer visit to a vacation home in the Swiss Alps, the habitual residence of the child is not Switzerland. The situation in the present case, while slightly more drawn out, is no different. The parties never jointly intended to make their permanent home in Belgium, and the birth of a baby during a short stay there to save on medical bills does not change the parties' "degree of settled purpose" regarding their child's habitual residence. There is no credible evidence that the stay in Belgium was ever jointly intended to be anything more than temporary. Rather, the overwhelming weight of the evidence is that both parties' stated intent before the birth was to go to Belgium to bear the baby, followed shortly thereafter by a return to New York as a home base for at least half of the year.

The Court finds that the Petitioner has failed to meet his burden to prove that Belgium is the habitual residence of Baby S. Thus, there has been no wrongful removal or retention of the infant.[12]

### CONCLUSION

For the foregoing reasons, Wim Delvoye's petition to return Baby S to Belgium is denied based upon insufficient evidence having been adduced to meet his burden of proving that Baby S was a habitual resident of Belgium and thus was wrongfully removed from that country. An appropriate order will issue.[13]

### ORDER

This matter having come before the Court by Wim Delvoye's Petition For Re-

---

that because the Respondent wants to be in the United States, so should the baby. Rather, the decision is based on the fact that both Petitioner and Respondent's stated intent to Ms. Sutherland, corroborated by all of the circumstantial evidence, is that Belgium was only a temporary place to give birth. In *Nunez–Escudero*, there was no comparable evidence. In this case, moreover, there is an utter lack of evidence to support Petitioner's burden to prove that Belgium is where the infant resided with "a degree of settled purpose."

12. Given this Court's conclusion as to the habitual residence of Baby S, it is unnecessary to address Respondent's argument that Petitioner consented to Respondent's removal of the infant to the United States within the meaning of Article 13a of the Convention. If it were to reach the consent issue, however, this Court would be inclined to find that Petitioner did, in fact, consent to the infant's removal. Based upon the fact that Petitioner signed a two-parent consent form for the infant's U.S. passport within days after instructing Respondent to "[l]eave with the baby now before I get attached," Petitioner's highly emotional request for a memento of the baby

prior to his departure, and his extended videotape of the departure scene at the airport, this Court does not find his testimony that he only consented to a two week visit to the United States credible.

It is also unnecessary for the Court to decide at this time whether return of the infant to Belgium would pose a grave risk of psychological harm under Article 13b of the Convention. Because Respondent's expert psychologist was unavailable at the hearing, the Court bifurcated this issue from the other issues in the case. Petitioner's pending *in limine* motion to exclude the expert's report and testimony is therefore dismissed as moot. The Court does note, however, that many serious questions were raised at the hearing regarding Petitioner's psychological condition. If it were necessary to reach the issue of psychological harm, this Court would take the testimony of the psychologist and consider appointing its own expert to examine Mr. Delvoye.

13. Given the Court's disposition of this matter after a full evidentiary hearing, Petitioner's pending motion for summary judgment is dismissed as moot.

turn Of Child To Belgium pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501, and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.;* and this Court having fully considered the submitted briefs and the record before it after a full hearing on the merits; and for the reasons expressed in the opinion issued this same day; and for good cause shown

**IT IS** on this 24th day of September, 2002,

**ORDERED** that the petition is **DENIED;**

**ORDERED** that all other pending motions in the above-captioned matter are **DISMISSED** as moot; and

**ORDERED** that this case is **CLOSED.**