Luis Alberto Angulo GARCIA
Petitioner,

v.

Rosnaira Cecilia Fernandez
ANGARITA Respondent.

No. 06–20383–CIV.

United States District Court,
S.D. Florida.

July 14, 2006.

Lawrence Sheldon Katz, Lawrence S. Katz, P.A., Miami, FL, for Petitioner.

Patrick Vilar, Bofill & Vilar, Miami, FL, for Respondent.

Rosnaira Cecilia Fernandez Angarita, Miami, FL, Pro se.

### ORDER DIRECTING RETURN OF MINOR CHILDREN

HUCK, District Judge.

THIS CAUSE is before the Court on Petitioner, Luis Alberto Angulo Garcia's Emergency Petition for Return of Children pursuant to the Hague Convention on the Civil Aspect of International Child Abduction ("the Hague Convention"), and the implementing legislation set forth in 42 U.S.C. § 11601, et seq. On February 16, 2006, the Court referred this matter to Magistrate Judge Andrea M. Simonton, to hold a final evidentiary hearing on whether Petitioner and Respondent, Rosnaira Cecilia Fernandez Angarita's children, Alonso Carlos Angulo Fernandez, Julio Luis Angulo Fernandez, and Luis Alberto Angulo Fernandez, should be returned to Colombia with Petitioner, in accordance with the Hague Convention and to issue a report and recommendation. Magistrate Judge Simonton held an evidentiary hearing on April 6, 7 and 19, 2006. On June 20, 2006, Magistrate Judge Simonton issued her Report and Recommendation ["Report"]. In her Report, Magistrate Judge Simonton thoroughly analyzed the legal and factual issues presented by the Petition and Respondent's Answer, outlined the evidence presented at the evidentiary hearing and made extensive findings of facts and conclusions of law. Magistrate Judge Simonton has recommended that the Petition be granted and that the parties' children be ordered returned to Colombia. The Report also provided that the parties had ten days after service of the Report in which to file written objections to the Report, advising that failure to timely file an objection to the Report would preclude the nonobjecting party from attacking any factual findings contained in the Report. *See Lo-Conte v. Dugger,* 847 F.2d 745 (11th Cir.), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988). The parties did not object to the Report.

The Court has reviewed the Petition, the Answer, the Report, the parties' legal memoranda and pertinent portions of the record. In doing so, the Court finds that Magistrate Judge Simonton has fairly and correctly analyzed the relevant facts and applied the applicable law in relation to the issues raised in the Petition and Answer. Accordingly, the Court approves and adopts by reference the findings of fact and conclusions of law set forth in the Report. The parties' children, Alonso Carlos Angulo Fernandez, Julio Luis Angulo Fernandez, and Luis Alberto Angulo Fernandez shall be returned to their home in Colombia on or before August 7, 2006. The parties shall reasonably and fully cooperate in making arrangements to accomplish the return of their children to Colombia. In the event the parties are unable to unwilling to cooperate in the effort to return the children as ordered, either party may seek further assistance of the Court. The Court reserves jurisdiction to consider any request for fees and costs. The Clerk shall close this case.

## REPORT AND RECOMMENDATION

SIMONTON, United States Magistrate Judge.

This matter arose upon the Petition for Return of Children pursuant to the Hague Convention on the Civil Aspect of International Child Abduction (hereafter referred to as the Hague Convention), and the implementing legislation set forth in 42 U.S.C. § 11601, *et seq.* (DE # 1). This matter has been referred to the undersigned Magistrate Judge by the Honorable Paul C. Huck, United States District Judge, to hold a final evidentiary hearing on whether the children Alonso Carlos Angulo Fernandez, Julio Luis Angulo Fernandez, and Luis Alberto Angulo Fernandez should be returned to Colombia with their father, Luis Alberto Angulo Garcia, in accordance with the Hague Convention (DE # 5). Petitioner has filed a Memorandum of Law in support of the Petition (DE # 3); Respondent has filed an Answer (DE # 16) and an opposing Memorandum of Law (DE # 19); Petitioner has replied (DE # 21) and has also filed a supplementary memorandum (DE # 33). An evidentiary hearing was held on April 6, 7 and 19, 2006. For the reasons set forth below, the undersigned recommends that the Petition be GRANTED.

## I. BACKGROUND

Petitioner Luis Alberto Angulo Garcia requests this Court to enter an Order directing that his three minor children, Alonso Carlos Angulo Fernandez, Julio Luis Angulo Fernandez and Luis Alberto Angulo Fernandez be returned to Colombia. He alleges that the children's mother, Rosnaira Cecilia Fernandez Angarita, wrongfully removed the children from their habitual residence in Colombia on or about July 25, 2005, and has wrongfully retained them in the United States (DE # 1, ¶ 8). Petitioner also claims that he has rights of custody of the children under the law of Colombia in that he is their natural father and is married to Respondent; and that he was actually exercising these rights within the meaning of the Hague Convention at the time of their wrongful removal (DE # 1 at ¶ 10). Petitioner was a citizen and resident of Colombia at the time he made this request to the Central Authority of Colombia (DE # 1 at ¶ 10).

Respondent contends that Petitioner did not have custody rights under Colombian law, but only visitation rights, and therefore the removal of the children from Colombia was not wrongful. Respondent also contends that Petitioner consented to the travel of the children to the United States and subsequently acquiesced to the retention of the children in Miami. In addition, Respondent relies upon the objection of the children to their return, and also contends that return would subject the children to psychological harm and place them in an intolerable situation (DE ## 16, 19). Respondent concedes that Colombia was the habitual residence of the children prior to their removal.

Petitioner replies that he had rights of custody which he was exercising; that he did not consent to the removal of the children from Colombia to reside in Miami, but only to their travel to New York for a short visit with their uncle; that he did not acquiesce to their retention in Miami, but immediately took steps to obtain their return pursuant to the Hague convention; that there is no grave risk of psychological harm or an Intolerable situation; and that none of the children have attained the requisite age and degree of maturity at which it is appropriate to take their views into account (DE # 33).

## II. FINDINGS OF FACT

### A. Introduction

An evidentiary hearing was held on April 6, 7 and 19, 2006, at which the Peti-

tioner testified on his own behalf and presented the testimony of his mother (Cecilia Garcia de Angulo), his brother-in-law (Mauricio Martinez), and an attorney who works at the Apostolic Mission of Christ in Miami, and with whom Respondent met after she arrived in Miami (Alberto Guerrero). Petitioner also presented the Affidavit of Colombian attorney Maria Eugenia Gomez Chiquiza (Pet.Ex. 17), and excerpts of Colombian law (Pet. Ex. 18 & 19). In addition, he introduced the psychological report of Alonso Angulo prepared by Miguel Firpi, Ph.D., pursuant to a court order, and adduced the testimony of Dr. Firpi. Various other exhibits were introduced to corroborate Petitioner's testimony regarding his relationship with his children and his efforts to secure their return.

Respondent testified on her own behalf, and presented the testimony of attorney Cella Torres–Mestre as an expert in Colombian law. Respondent requested the Court to consider the testimony of Alonso Carlos Angulo Fernandez regarding his desire to remain in the United States. After considering the report and testimony of Dr. Firpi, and considering the *in camera* testimony of Alonso Carlos Angulo Fernandez, the undersigned ruled that he was not of sufficient age and maturity such that his views should be taken into account.

To the extent that the testimony of Respondent was contradicted by the testimony of Petitioner and his witnesses, the undersigned finds that Respondent was not a credible witness. This credibility determination is based upon the inconsistencies between her testimony and certain statements she made during the course of her interview by Dr. Firpi, her demeanor and evasiveness while testifying, and the determination that she was not truthful when she advised the Court at the initial hearing that she was represented by an immigration attorney, Dr. Guerrero, that the I–94 immigration forms for herself and her children had been given to him, and that he had retained them. Dr. Guerrero's testimony flatly contradicted these assertions, although he recalled one brief meeting with Respondent. Dr. Guerrero was retained by the Catholic Church to screen persons seeking immigration assistance from the Church; he never retains documents from any of the persons who consult with him, and he does not prepare documents or file papers on their behalf. His role is to meet briefly with persons seeking assistance, determine whether he believes they have a basis for seeking residence in this country and then to send them on to others who are associated with the church. He met with Respondent for about ten minutes in approximately early February 2006, and he did not retain any documents from her or agree to represent her in further proceedings. Although the substance of this meeting is not relevant to the issues presently pending before the Court, the fact that Respondent was untruthful to the Court at the inception of this case casts doubt on her credibility with respect to her testimony.

Based upon the above credibility determination, and considering the record as a whole, the undersigned makes the following findings of fact.

## B. *The Events Prior to Respondent's Move to Bogota*

Petitioner and Respondent were married in Colombia on January 29, 1994. The three children who are the subject of the Petition in the case at bar were born during the marriage, and are the natural children of the Petitioner and Respondent. Alonso Carlos Angulo Fernandez was born on October 7, 1994, and was eleven years old at the time of the hearing. Julio Luis Angulo Fernandez was born on July 24,

1996, and was nine years old at the time of the hearing. Luis Alberto Angulo Fernandez was born on February 10, 1999, and was six years old at the time of the hearing.

The marital relationship was stormy, and both sides have accused each other of physical and verbal abuse. The parties have separated several times, and in 2002 Respondent Initiated divorce proceedings, which she later abandoned. According to Respondent, whose testimony on this point was not disputed, they separated in 1996 for seven months, in 1997 for six months, in 2000 for one and one-half years, in 2002 for one year and two months, and most recently on July 24, 2004.

Throughout the marriage, and including the periods of separation, the children have lived with Respondent. Petitioner, however, has maintained close contact with the children and has provided financial support. When the children were sick, either Petitioner or his mother took them to the doctor; or else they were generally taken by their nanny. Petitioner has arranged for the children's schooling and healthcare, and he has seen them frequently, as described in more detail below with respect to the arrangements that occurred following the most recent separation. No verbal or physical abuse has been directed against the children. Until the children were removed from Colombia, Petitioner never objected to Respondent having physical custody of the children, and Respondent never objected to the children staying with Petitioner for extended periods of time. Thus, the undersigned finds that neither parent poses a risk of inflicting harm on the children as a result of the outcome of these proceedings.

Prior to July 24, 2004, Petitioner and Respondent resided together in Barranquilla, Colombia. That evening, Respondent called Petitioner's mother, Cecilia Garcia de Angulo, and told her to come and take Petitioner away or she would kill him. Petitioner's mother went to the residence and found that Petitioner had locked himself in a room. Petitioner and his mother than left the residence, and Petitioner began residing with his mother a short distance away. The children visited their grandmother's residence almost every day, and stayed there on the weekends, until they moved to Bogota, Colombia on November 27, 2004.

## C. The Move to Bogota

On November 27, 2004, Petitioner and Respondent attended a mediation session with a Family Ombudsman at the Colombian Department of Social Protection, Colombian Institute of Family Well–Being (DE # 29, Pet. Ex. 2). The purpose of the mediation was to try to resolve a custody dispute between the parties, which stemmed from Respondent's desire to move to Bogota with the children, and Petitioner's objection to this change of residence. The mediator determined that "provisional custody" would remain with Respondent since the parties were unable to agree, and that the parties were permitted to go to court to resolve this conflict. Petitioner chose not to go to court for a judicial order at the time and therefore acquiesced in Respondent's move to Bogota. Respondent also did not go to court for a judicial permanent custody determination.

On the same date as the custody mediation, the parties appeared before the same mediator with respect to a child support determination. Based upon the agreement of the parties, the mediator entered a Conciliation decree which required Petitioner to pay the agreed child support (Pet.Ex. 3).

Petitioner maintained frequent contact with the children following their move to Bogota. The children returned to Barran-

quilla several times, and stayed with their father at their grandmother's house, until they were taken to Miami in July 2005. For example, on December 25, 2004, he sent them airline tickets for their return to Barranquilla to stay with him until mid-January 2005. In February 2005, Petitioner flew to Bogota to see the children and to make arrangements for their enrollment in a school, since Respondent had failed to enroll them. Respondent acknowledged that Petitioner saw and spoke to the children frequently while they were in Bogota.

During the time that Respondent lived in Bogota, her boyfriend, Jaime Curvelo, moved from Barranquilla to Join her in Bogota. In approximately April 2005, they participated in a marriage ceremony so that the children would believe that she was legally married to Curvelo (despite the fact that she remained married to Petitioner).

After Respondent moved to Bogota, Petitioner and Respondent communicated to each other through relatives or through their children. In approximately May 2005, the children told Petitioner that they had been invited to spend 15–20 days with their uncle who lived in Scranton, near New York. Petitioner agreed to let them go after they visited with him for fifteen days at the end of June. The children were supposed to leave on July 3, 2005, and were going to travel with either an aunt or an uncle.

### D. *The Circumstances Surrounding the Travel to the United States*

Based upon the above representation, Petitioner executed an authorization for the international travel of the children. He did not place any limitations on the authorization, but relied upon the representation that the purpose of the trip was for a visit with relatives in New York, and that the children would return to Colombia after that visit. The undersigned credits the testimony of Petitioner that he would not have granted an authorization for the children to travel to the United States to reside here, and he would have revoked his authorization if he had known of this purpose.

Petitioner's testimony is supported by the evidence that the children were all enrolled in school for the following year, commencing in August 2005, and that Petitioner maintained their health insurance, which was valid only in Colombia.

In early July, Petitioner was advised that the trip to New York had been delayed by a week. On July 16, 2005, the children called and said they were at the airport preparing to leave. On July 18, 2005, the children called and said they were in New York. In fact, that was all a deception. Although Respondent contended that the initial story regarding a visit to New York was true, she claimed that when the uncle was unexpectedly called back to Colombia, she decided to move permanently to Miami with the children and Jaime Curvelo.

Respondent testified that the original plan was for the children to travel to New York on July 3, 2005, to visit her uncle Hugo, and that she was not going to travel with them. The children were to travel either with Hugo or her brother Mariano. She further testified that Hugo called on July 2, 2005, and said that the children's trip was canceled. Respondent had received the authorization for the children's international travel from Petitioner at the end of June. She testified that she did not execute her own travel authorization, which was also required if she did not accompany the children, because they did not travel. She then claimed that her brother Mariano told her that he was going to travel to New York on business and that he would take the children with him. However, this trip was postponed due to

financial reasons. She then decided to move to Miami, but did not tell Petitioner because she believed she had the legal right to take the children based on his executed travel authorization. Prior to traveling to Miami, they traveled to Medellin, where they stayed for a few days. Although during her testimony Respondent denied knowledge of the phone call where Alonso falsely told his father that he was at the airport on the way to New York, in the interview with Dr. Firpi, she acknowledged involving the children in the planned deception. Specially, Dr. Firpi's report states:

> On July 16, 2005, Alonso called his father to tell him the family was on the way to the airport for the flight to New York. During the next few days, the children contacted their paternal grandmother and told her they were having a wonderful time in New York, but refused to provide a hotel name or telephone number. In fact, by the mother's admission, the children had been taken out of Bogota between the 16th and 25th of July to a town in the Department of Boyaca. Mrs. Fernandez acknowledged that the purpose of this sudden change in residence was to keep Mr. Angulo from knowing where the family was until she could take the family to Miami and so she could use the father's authorization to leave the country without his knowledge of their destination. Mrs. Fernandez flew to Miami with the children on July 25, 2005. Mrs. Fernandez acknowledged that she discussed the plan to deceive the father with her children and asked then to go along with it so that they could use the father's permission to travel to New York for the purpose of leaving Colombia for Miami.

(Pet. Ex. 20 at 3). Based upon the above circumstances, the undersigned doubts whether there ever was a plan for the children to travel alone to New York for a short visit with their uncle. If the trip was planned for July 3, 2005, and the mother's authorization was required, it does not make sense that the document had not already been executed by her by the time the trip was canceled on July 2, 2005. The undersigned credits the statements made by Respondent to Dr. Firpi regarding the planned deception of Petitioner with respect to the eventual move to Miami. The undersigned finds that Petitioner never consented to the international travel of his children to Miami, and never consented to their change of residence to Miami. The undersigned credits Petitioner's testimony that if he had been told of the true plan prior to their departure, he would have done whatever he could to stop it.

### E. Events Following Respondent's Arrival with the Children in the United States

Respondent and the children entered the United States at Miami, Florida on July 25, 2005, using tourist visas. Respondent testified that when she and the children first arrived in Miami they stayed at the Princess Hotel near the airport for approximately fifteen days. On July 28, 2005, she called Petitioner's mother and stated that she and the children were in Miami and were going to remain in Miami. Respondent stated that she was in a hotel and that they were going to move to an apartment; and that she would call and provide the address and telephone number when they moved. Respondent did not tell Petitioner's mother the name of the hotel, and Petitioner's mother did not ask. Petitioner learned of this call from his mother. Petitioner spoke to his children every 7 to 10 days after they arrived in Miami. These conversations occurred when the children called Petitioner, since he did not know their address or telephone number.

On August 20, 2005, Petitioner's mother, Cecilia Garcia de Angulo, traveled to Mia-

mi to visit her pregnant daughter, Olga and son-in-law, Mauricio Martinez. Respondent spoke to Mrs. Garcia de Angulo, and took the children to visit at the Martinaz's house. Respondent refused to provide her address or telephone number, stating that Petitioner wasn't paying her bills. Mrs. Garcia de Angulo bought her grandchildren a cellular telephone so that they could easily contact each other. Julio Luis refused to give her information about where they lived, telling her that if he did "his mother would hit him in the mouth." Olga's baby was born on August 27, 2005, and Mrs. Garcia de Angelo remained at Olga's house until December. During the time, the children stayed with her frequently.

Mauriclo Martinez testified that he was the person who discovered where the children were living. When the children came to visit, beginning in August 2005, they did not want to say where they lived. However, he learned from Julio Luis that they lived on Kendall Drive, near a Target store and a K–Mart store. Alonso told him that they were living in a new condominium that still had promotional flags around the building. Mauricio obtained this information in mid-September, and began driving around the streets in Kendall to locate the building. On the second day of searching, he found a likely building and waited nearby. He parked where he could not easily be seen and watched the Dodge Neon that he believed Respondent was using. Approximately one hour later, he saw two of the children enter the condominium. Mauricio wrote down the address and provided it to his brother-in-law, the Petitioner.

### F. Petitioner's Efforts to Secure the Return of the Children

In early August, 2005, almost immediately after learning that Respondent intended to keep the children in Miami, Petitioner began trying to locate the children and to obtain the documentation necessary to make a formal request for their return under the Hague Convention. Various exhibits introduced into evidence at the hearing, some of which are dated August 8, 2005, corroborate his early efforts.

Petitioner filed a lawsuit in Bogota in September 2005 to obtain custody of his children. Petitioner filed his Hague Convention Application on November 12, 2005. He also pursued a lawsuit in Barranquilla to obtain a divorce from Respondent. Petitioner initially brought criminal kidnaping charges against Respondent, but later decided not to pursue the criminal charges.

Petitioner has seen the children and spoken to them frequently in Miami. For example, on October 7, 2005, Petitioner traveled to Miami to celebrate Alonso's birthday. Respondent permitted the children to stay with their father, grandmother and cousins until October 23rd or 24th. Respondent first learned of Petitioner's objection to the children remaining in Miami in early December when Respondent received written notice from Colombia that he requested custody of the children. The presently pending Petition was filed on February 14, 2006. Respondent has voluntarily permitted the children to visit Petitioner's family; and, the children, Petitioner and Petitioner's family have had frequent contact prior to and during the course of these proceedings. On December 6, 2005, the two youngest children visited with Petitioner at his sister Olga's house until December 15, 2005. The oldest child, Alonso, did not want to go, and therefore he stayed behind. The undersigned credits the testimony and report of Dr. Firpi that Respondent has involved Alonso in her dispute with Petitioner as her "confidant" and has alienated Alonso from his father. In December 2005, she received documents from Colombia concerning the kidnaping charges and custody

case, and Alonso became concerned that his father was going to put his mother in jail, and refused to see him. Thereafter, in February 2006, Respondent took Alonso to dinner and reassured him that Respondent was not going to go to jail. Alonso has since visited with his father in Miami.

### G. *Dr. Miguel Firpi's Evaluation*

At the request of Respondent, and over the objection of Petitioner, the undersigned Magistrate Judge ordered a psychological evaluation of Alonso. Respondent alleged that there was grave risk that Alonso and the other children would suffer psychological harm and be placed in an intolerable situation if forced to return to Colombia; that Alonso objected to his return; and, that on February 21, 2006 Alonso had taken a knife and threatened to commit suicide if forced to return. A psychological evaluation was therefore ordered to determine whether there was a grave risk that return would expose Alonso to psychological harm and whether Alonso was of sufficient age and degree of maturity that it would make it appropriate to take his views into account. Based upon this ruling, the parties agreed that Miguel A. Firpi, Ph. D. should perform the evaluation. Dr. Firpi conducted two clinical Interviews of Alonso, as well as separate parent interviews with Petitioner and Respondent, and joint parent child interviews (one with each parent). The psychological testing consisted of the Child Depression Inventory, Behavioral Assessment System for Children–2 Child Self Report Form, and the Milion Pre–Adolescent Clinical Inventory. Dr. Firpi also reviewed various documents, which are listed in his report (Pet. Ex. 20; DE # 27).

Dr. Firpi concluded that Alonso was not suffering from any major mental health disorder, and his academic and social functioning was within normal limits. Alonso did not report, and did not appear to be, in fear for his safety in the company of either parent. With respect to Alonso's preference to remain in the United States with his mother, Dr. Firpi stated in Conclusions 3 and 4 of his report:

3. Alonso's feelings and preferences appear to be affected by two major factors: a). his desire to stay in the United States and his rejection of the idea that he might be returned to Colombia and, b). an alignment and somewhat enmeshed relationship with his mother that has led him to perceive that he must take his mother's side in this matter, be protective of her, and act as a spokesperson for her concerns. In some regards, Alonso's preferences and behaviors are consistent with that of children who are alienated from one parent as a result of the nature of their relationship with the other. The fact that Mrs. Fernandez has openly involved the children in deceptive behavior toward the father and that the child has detailed knowledge of marital and legal issues in this case is very concerning in this regard. The potential long term negative psychological consequences of having children involved in high conflict marital situations are significant in terms of the increased risk for overall maladjustment. . . .

4. Children can be highly suggestible to information provided by adults they trust. Mrs. Fernandez's Involvement of the child in openly deceptive actions and in providing the child information that is negative about his father is likely to exert a significant influence on the child's ability to perceive reality accurately. The evaluator believes that Alonso's preferences have been strongly influenced by his mother and are to a great extent the reflection of her

needs and desires. This child does not have the insight at this time to separate his identity, his desires and his wishes from those of the mother, not just because of his age, but also because of the degree of enmeshment observed between him and his mother.... This evaluator is of the opinion that Alonso has developed a biased and tainted perception of his parents (a particularly negative view of his father and an enmeshed, overly idealized view of his mother) and that his preferences should be considered very cautiously, if at all. This child does not have the emotional and intellectual maturity to identify his bias and act with developmentally appropriate autonomy.

(Pet. Ex. 20; DE # 27 at 12–13).

In response to the Court's preliminary determination that Alonso would be permitted to testify and express his views, Petitioner sought to re-open his case to present testimony from Dr. Firpi that would further explain his conclusions and that would demonstrate the harmfulness to Alonso' psychological well-being if Alonso were permitted to testify on behalf of one parent and against the other. The Court granted this request, and the hearing was continued to a later date when Dr. Firpi was available to testify.

In his testimony, Dr. Firpi stated unequivocally that Alonso was not sufficiently mature for his views to be taken into account. This conclusions was based on the age and developmental stage of eleven year old children generally, the special circumstances in this case concerning the contentious separation of his parents, the interaction of Alonso's own personality with these factors, and the fact that during the course of the evaluation, Alonso demonstrated an unhealthy alignment with his mother.

Dr. Firpi also opined that permitting a child of Alonso's age to testify against a parent is very powerful and potentially damaging psychologically, since it can interfere with the ability to establish a positive relationship with the adverse parent.

In both his report and testimony, Dr. Firpi expressed the opinion that ordering Alonso's return to Colombia would not result in a grave danger of psychological harm, however, he opined that Alonso may express a negative reaction and it was "possible that he would impulsively attempt to control that decision by acting out in a manipulative manner." (Pet. Ex. 20 at 14). Dr. Firpi opined that the intensity and duration of this negative psychological reaction would be determined by how his parents and relatives managed their own reactions. For example, the severity would be increased by the mother's refusal to return with the children and the accompanying fear of loss of that relationship.[1] in addition, the severity would be increased by a dramatic and "out of control" reaction by the mother and negative take about the father.

On the other hand, Dr. Firpi listed numerous factors that would likely attenuate and mitigate the reaction. These factors include the history of a positive, well-established bond and relationship with the father prior to their move; the presence in Colombia of an extended family support system, including a well developed bond with the paternal grandmother; and a supportive and familiar school environment with friends. In addition, the reassurance that the mother will not be incarcerated

---

1. In December 2005, Respondent gave birth to a child by Jaime Curvelo; and at the time of the hearing she was pregnant with a second child. As noted by Dr. Firpi, she expressed great reluctance to leave the United States and deprive her new children of the opportunity to be raised in the United States (Pet. Ex. 20, DE # 27 at 15).

and the mother's return to Colombia with the children will serve as mitigating factors.

With respect to Alonso's suicide gesture, which was one of the main factors in the Court's decision to grant the request for a psychological evaluation, Dr. Firpi stated that Alonso reported that he had no real intention of harming himself, and had acted impulsively out of desperation after reading the court papers and seeing his mother so upset by them. Dir. Firpi opined that Alonso was not clinically depressed and did not have significant or chronic suicide ideation.

In sum, Dr. Firpi concluded:

> Overall, the evaluator believes that Alonso's return to Colombia, although it would trigger an intense and immediate reaction, by itself does not pose a grave danger to the child in the long term, as long as it is managed appropriately by both parents and the child's support system is quickly engaged. The evaluator also believes that significant psychological damage to the child's emotional and social development will ensue if clear parent-child boundaries are not established and if negative perceptions of the father continue to be fostered by the mother, whether this occurs directly or indirectly, consciously or unconsciously.

(Pet. Ex. 20, DE # 27 at 15).

### H. *The Law of Colombia*

The relevant statutory provisions of Colombian law were introduced into evidence by Petitioner (Pet. Exs. 18 and 19), together with an Affidavit of Maria Eugenia Gomez Chiquiza (Pet.Ex. 17), a lawyer who resides in and who is licensed to practice law in Colombia. In opposition, Respondent presented the testimony of Cella Torres–Mestre, an attorney who resides in Miami, Florida who is licensed to practice law in the United States and Colombia.

Title XII of the Colombian Civil Code sets forth the rights and duties between parents and children. Article 253 provides, "Both parents . . . shall exercise the parental care in the upbringing and education of their legitimate children" (Pet. Ex. 13).

Title XIV of the Colombian Civil Code sets forth the rights of "Patria Potestas." Article 288 provides that "Paternal authority is the set of rights that the law acknowledges to the parents over their non-emancipated children . . . ." It further provides that, "The exercise of the parental authority over their legitimate children shall be exercised jointly by both parents. In the absence of one of the parents, the other parent shall exercise the paternal authority." (Pet.Ex. 18). Article 338 of the Colombian Minors' Code provides that, "When a minor is going to go out of the country with one of the parents or with a person different from their legal representatives, they should previously obtain the permission of the parent or legal representative who is not traveling, authenticated before a notary or consular authority" (Pet.Ex. 17, ¶ 5).

The only statement of qualifications and expertise provided with respect to Attorney Gomez is her statement that she is a licensed attorney in Colombia who is familiar with the laws upon which she opines. Attorney Gomez opined that, at the time of their removal to the United States, the *patria potestas* rights over the children were being exercised by both parents since Petitioner had not been deprived or limited with respect to those rights by any judicial decision. Thus, both parents were responsible for the upbringing, education, personal care and education of the children, and the express authorization of both parents was required for the children to leave the country. In her opinion, the Colombian courts had jurisdiction and

competence to make a final custody determination since the children had been removed without proper consultation and without the father's authorization to settle permanently in the United States (Pet.Ex. 17).

Attorney Cella Torres–Mestre was licensed to practice in Colombia in 1982. She has handled numerous cases in Colombia involving family law, although the majority of her work since 1996 has been as a family mediator in South Florida. Ms. Torres–Mestre has been involved in at least one case involving the application of the Hague Convention, but, as she acknowledged, she is not sufficiently familiar with the Convention to serve as an expert on its provisions. She is, however, sufficiently qualified to serve as an expert on Colombian law. In her opinion, the applicable provisions of the Colombian Code do not specifically address which parent has the right to determine where a child may reside. Based upon the provisional custody order, Ms. Torres–Mestre opined that Respondent had the right to determine where, within Colombia, the children would reside. She testified that the Ministry of Social Protection, acting through the family mediator, had the authority to make provisional custody decisions until the Court renders a final decision. Only the Court, however, could remove the *patria potestas* rights. She acknowledged that the children would not be permitted to reside in another country unless both parents consented, or there was a Court order permitting the relocation. Moreover, she noted that the consent to international travel could be limited to a particular time, location or purpose. She also opined that an unlimited travel authorization such as the one executed in the case at bar would legally permit the children to leave the country permanently, even if the authorization were obtained by misrepresentations.

Petitioner objected to the testimony of attorney Mestre–Torres on the grounds that she was not qualified as an expert and on the grounds that no expert report was furnished. The undersigned determined that she was qualified to testify based on her training and experience with respect to Colombian law. With respect to the lack of notice, the undersigned ruled that Petitioner would be permitted to present any additional expert testimony in his rebuttal case, and that the necessary time to obtain such testimony would be provided. Petitioner did not present any rebuttal expert testimony.

Based on the testimony of both experts, the undersigned finds that under Colombian law both parents exercised the rights of *patria potestas* at the time of the children's removal to the United States. However, based upon the provisional custody decree, the mother had the right to determine where, within the country of Colombia, the children would reside, at least until the Colombian courts entered a final decree that stated otherwise. The father retained a *ne exeat* right, however, pursuant to the provisions of Article 338 of the Minor's Code. Therefore, the mother was not permitted to relocate the children outside of Colombia without the permission of the father.

In the case at bar, the undersigned finds that the father did not consent to the relocation of the children to the United States to live, and that the use of the travel authorization for this purpose was fraudulent. This result is not changed by the fact that the written travel authorization was not expressly so limited. It is clear from the testimony of both parties that the authorization was intended to apply to a short visit to New York, like similar previous trips, and not to a permanent relocation.

## III. *LEGAL ANALYSIS*

### A. *Framework for Analysis*

■ This case is governed by the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1988 WL 411501; which was implemented by the United States through the enactment of the international Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.* ("ICARA"). As stated in Article One, the objects of the Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State." This Court has jurisdiction pursuant to 42 U.S.C. § 11603(a). in order to obtain the return of a child, Petitioner is required to prove by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e). As stated by the Eleventh Circuit Court of Appeals in *Furnes v. Reeves,* 362 F.3d 702, 712 (11th Cir.), *cert. denied,* 543 U.S. 978, 125 S.Ct. 478, 160 L.Ed.2d 355 (2004) (citations omitted):

> [T]he Hague Convention provides that the removal or retention of a child from his or her State of habitual residence is wrongful if ... (1) the child has been removed or retained in violation of the petitioner's "rights of custody," i.e., "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence," either jointly or alone; and (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."

As further noted by the Court, the rights of custody to which the Convention refers may arise by operation of law, by reason of judicial or administrative decision or by reason of the parties' agreement.

■ Once a petitioner meets this burden, return of the child will be ordered unless the respondent prevails on one of the available affirmative defenses. Specifically, a Court may decline to return a child if the respondent proves by a preponderance of the evidence that the petition for return was filed more than one year from the removal or retention and the child is well-settled in his new environment; or that the petitioner was not actually exercising his custody rights at the time of the removal or retention; or that the petitioner had consented to or acquiesced in the removal or retention; or if the Court finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." 42 U.S.C. § 11603(e)(2)(B), incorporating Articles 12 and 13 of the Convention.

■ In addition, pursuant to 42 U.S.C. § 11603(e)(2)(A), a Court may decline to return a child if the respondent proves by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation;" Convention, Art. 13(b); or the return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Convention Art. 20.

It is important to keep in mind, however, that the role of this Court is not to determine the issue of custody, but only to order the return of a child wrongfully removed or retained outside the country of habitual residence. Article 19 of the Convention expressly states, "A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody

issue." As succinctly stated by the Court in *Ahumada Cabrera v. Lozano*, 323 F.Supp.2d 1303, 1310 (S.D.Fla.2004):

> The Convention was designed to restore the pre-abduction status quo and to deter parents from crossing international borders in search of a more sympathetic forum. *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir.1998) (*citing Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)). The underlying premise of the Hague Convention is that a child's country of habitual residence is the place where decisions relating to custody and access are best decided. *Bocquet v. Ouzid*, 225 F.Supp.2d 1337, 1340 (S.D.Fla.2002). Therefore, a court considering an ICARA petition has jurisdiction over the wrongful removal or retention claim but not the underlying custody dispute. *Lops*, 140 F.3d at 936.

In the case at bar, Respondent asserts that Petitioner did not have any rights of custody under Colombian law within the meaning of the Convention, and therefore Respondent's removal was not wrongful;[2] that Petitioner consented and acquiesced to the children's change of residence to the United States; that Alonso objects to his return and the Court should honor this objection by refusing to order his return; and finally, that the return of the children would expose them to a grave risk of psychological harm. Each of these issues is discussed below.

### B. *Petitioner Had Sufficient Rights of Custody and Respondent's Removal of the Children Was Wrongful*

Petitioner claims that he had joint custody rights under the *patria potestas* provisions of Title XIV of the Colombian Civil Code, Article 288 and Title XII of the Colombian Civil Code, Article 253; as well

as the *ne exeat* provisions of Article 338 of the Colombian Minors Code. Respondent contends that the above cited joint parental responsibility and *patria potestas* provisions do not address the issue of the right to determine where a child resides, and that, in any event, the provisional custody order entered by the family mediator gave sole custody to Respondent. In addition, Respondent contends that the *ne exeat* statute, which requires both parents to consent to international travel of their children absent a court order, does not constitute a right of custody.

■ The undersigned agrees with Petitioner that this case is governed by the decision of Eleventh Circuit Court of Appeals in *Furnes, supra*. In *Furnes*, the Court expressly ruled that Petitioner's right under Norwegian law to prohibit the child from living abroad, constituted a "right of custody" within the meaning of the Hague Convention, even though Petitioner did not have the right to determine where, within the country of Norway, the child would reside. In reaching this result, the Court stated:

> In analyzing whether a parent has custodial rights under the Hague convention, it is crucial to note that the violation of a *single* custody right suffices to make removal of a child wrongful. That is, a parent need not have "custody" of the child to be entitled to return of his child under the convention; rather, he need only have one right of custody. Further, he need not have a *sole* or even *primary* right of custody....
>
> . . . . .
>
> The Convention does not explicitly define the term "place of residence." In

---

**2.** Respondent agrees with Petitioner that the habitual residence of the children prior to their travel to the United States on July 25,

2005 was Colombia, and that the issue of custody rights is governed by Colombian law.

light of the context of the Hague convention, we believe that the right to determine whether the child lives within or outside Norway constitutes a right to determine the child's place of residence. The Hague convention was designed to provide a remedy not for whether [the child] should live in Bergen or Oslo within Norway ([Respondent's] right), but for whether [Respondent] should be able to take [the child] across international borders. Thus, in our view, the only logical construction of the term "place of residence" in the Convention would necessarily encompass decisions regarding whether [the child] may live outside of Norway. Therefore, what country a child lives in, as opposed to what city or house within Norway, constitutes a right to determine a child's place of residence under Article 5 of the convention and thus a right of custody under the Convention. Given that the goal of the Hague convention is to deter international abduction, we readily interpret the *ne exeat* right as including the right to determine the child's place of residence because the *ne exeat* right provides a parent with decision-making authority regarding the child's international relocation.

362 F.3d at 714–15. In reaching this result, the Eleventh Circuit expressly rejected the decisions of the Second, Fourth and Ninth Circuit Courts of Appeal, Including *Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir.2002), the case upon which Respondent placed heavy reliance at the hearing.

In addition, the undersigned finds that Petitioner retained his *patria potestas* rights, and that these rights, which provide for the joint exercise of parental authority, reinforce the determination that Petitioner has certain rights of custody. *See Lalo v. Malca*, 318 F.Supp.2d 1152 (S.D.Fla.2004); *Giampaolo v. Erneta*, 390 F.Supp.2d 1269 (N.D.Ga.2004). The undersigned rejects the apparent argument of Respondent's

counsel that the only custody right that matters is the right to determine the place of residence. Rather, the Convention provides this right as an example of a custody right that is sufficient to invoke its provisions. As noted by the Court in *Furnes*, "the report containing the official history and commentary of the Convention states, 'the intention [of the Convention] is to protect *all* the ways in which custody of children can be exercised,' and the Convention favors 'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.' Elisa Perez–Vera, Explanatory Report: Hague Conference on Private International Law, In 3 Acts and Documents of the Fourteenth Session (Child Abduction) 426, 446–47, ¶¶ 71, 67 (1981)." 362 F.3d at 716 n. 12. *See also* Perez–Vera Report ¶ 84, which states, "As regards custody rights, the Convention merely emphasizes the fact that it includes in the term 'rights relating to the care of the person of the child', leaving aside the possible ways of protecting the child's property...the convention seeks to be more precise by emphasizing, as an example of the 'care' referred to, the right to determine the child's place of residence."

■ There can be no question that Petitioner was actually exercising his custody rights. At the outset, Respondent recognized that the children could not travel abroad without Petitioner's consent, and he gave his consent to international travel only for the limited purpose of a vacation with their Uncle Hugo. In addition, Petitioner saw and spoke to the children frequently, even after their move to Bogota; and, he paid support and arranged for their schooling in Bogota, as well as providing health insurance. "[T]he exercise of custody rights includes a parent's providing financial support and attempting to keep, or to seek, regular contact with a

child. *Ahumada Cabrera,* 323 F.Supp.2d at 1311–12 citing *Mendez Lynch v. Mendez Lynch,* 220 F.Supp.2d 1347, 1359 (M.D.Fla. 2002) (quoting *Friedrich,* 78 F.3d at 1065)." *Leslie v. Noble,* 377 F.Supp.2d 1232, 1243 (S.D.Fla.2005); *see Furnes,* 362 F.3d at 723 (but for the wrongful removal, Furnes would have exercised his rights under *ne exeat* clause by either consenting to the relocation or withholding consent).

Based upon the above circumstances, the undersigned concludes that Petitioner has established by a preponderance of the evidence that he had rights of custody under Colombian law, within the meaning of ICARA and the Hague Convention, and that he was exercising those rights.

C. *Petitioner Neither Consented nor Acquiesced in the Children's Residence in the United States*

Article 13(a) of the Convention permits the Court to refuse to order the return of children, despite a wrongful removal or retention, if Respondent proves by a preponderance of the evidence that Petitioner "had consented to or subsequently acquiesced in the removal or retention." The Third Circuit Court of Appeals recently explained the contours of this defense in *Baxter v. Baxter,* 423 F.3d 363, 371–72 (3rd Cir.2005) (Internal citations omitted):

> Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow. The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. Although the law construing the consent defense under the Convention is less developed, the defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing

written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." Courts have held the acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced.

Consent need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a). Often, the petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute. The consent and acquiescence inquiries are similar, however, in their focus on the petitioner's subjective intent. In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the convention.

■ In the case at bar, Petitioner's agreement to allow the children to travel to the United States for a brief visit does not constitute consent to their relocation here. The evidence of the deception Respondent perpetrated on Petitioner regarding the children's departure, as well as Petitioner's testimony and the actions he took to secure their return under the Hague Convention overwhelmingly supports the finding that he did not consent to their permanent residence in the United States.

■ Moreover, Respondent has failed to prove that Petitioner acquiesced in her retention of the children in the United

States following their wrongful removal. Although Respondent argues vigorously that Petitioner never told her that he objected to their residence here until she was served with custody papers in November or early December, and later with this lawsuit in February, this delay does not constitute acquiescence. Respondent never sought Petitioner's agreement, and Petitioner never said or did anything which would constitute acquiescence. Rather, within approximately two weeks after learning of Respondent's intentions, and before he even knew the address where his children were residing, Petitioner began to gather the information necessary to making a formal request under the Hague Convention. His decision to rely on the legal process rather than to try to persuade Respondent to change her mind does not constitute acquiescence.

Therefore, the undersigned concludes that this defense has not been established.

### D. The Children Are Not of Sufficient Age and Maturity Such That Their Objections Should Be Taken Into Account By the Court

■ Under the second paragraph of Article 13 of the Convention, the Court has the discretion to refuse the return of a child where the child objects and is of sufficient age and maturity such that the objection should be taken into account by the Court. Alonso is eleven years old, Julio is nine years old, and Luis is seven years old. The only child who may arguably be of sufficient age and maturity is Alonso. It is clear that Alonso objects to being returned to Colombia, and would prefer to reside in the United States. Based upon the evaluation of Dr. Firpi, and the Court's consideration of the testimony of Alonso, the undersigned has concluded that his views should not be taken into account by the Court. Although Alonso is an impressive, well-mannered and articulate eleven-year old, the undersigned

credits the opinion of Dr. Firpi that, based upon the circumstances of this case set forth in detail in the above Findings of Fact, he is not of sufficient age and maturity such that the court should refuse to order his return based on his objection. *See Hazbun Escaf v. Rodriquez,* 200 F.Supp.2d 603, 615 (E.D.Va.), *aff'd* 52 Fed. Appx. 207 (4th Cir.2002), *cert. denied,* 538 U.S. 1000, 123 S.Ct. 1911, 155 L.Ed.2d 827 (2003) (return ordered despite objection of 13–year old); *Giampaolo v. Erneta,* 390 F.Supp.2d 1269 (N.D.Ga.2004) (return ordered despite consideration of views of ten-year old).

### E. Return of the Children Would Not Expose Them to a Grave Risk of Harm

Pursuant to Article 13(b) of the Convention and 42 U.S.C. § 11603(e)(2)(A), a Court may decline to return a child if Respondent proves by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Courts construing this defense have held that it is only applicable in extraordinary cases when the grave harm contemplated by the Convention is directed at the child in question. In *Friedrich v. Friedrich,* 78 F.3d 1060, 1069 (6th Cir. 1996), the Court narrowly construed this exception to apply only in two circumstances:

[W]e believe that a grave risk of harm for the purposes of the convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine or disease. Second, there is a grave risk of harm in cases of serious dependence, when the court in a country of habitual residence, for whatever reason, may be incapable

or unwilling to give the child adequate protection.

In *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir.2000), *cert. denied*, 531 U.S. 1159, 121 S.Ct. 1113, 148 L.Ed.2d 982 (2001) (footnote omitted), the Court provided the following guidance:

> The text of the article requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. *See Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 377 (8th Cir.1995). Not any harm will do nor may the level of risk of harm be low. The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. *See* Hague Convention, art. 1. For example, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another"; otherwise, the goals of the Convention could be easily circumvented. *Re A. (a Minor) (Abduction)* [1988] 1 F.L.R. 365, 372 (Eng.C.A.); *see also Friedrich*, 78 F.3d at 1067–68; *Re C, (Abduction: Grave Risk of Psychological Harm)* [1999] 1 F.L.R. 1145 (Eng.C.A.); *C. v. C. (Minor: Abduction: Rights of Custody Abroad)* [1989] 1 F.L.R. 403, 410 (Eng.C.A.). Courts are not to engage in a custody determination, so "[I]t is not relevant … who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home … and terminate her marriage." *Nunez–Escudero*, 58 F.3d at 377; *see also* Department of State, Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed.Reg. 10,484, 10,510 (1986) ("[Article 13(b)] was not intended to be used by defendants as a vehicle to litigate … the child's best interests.").

Similarly, in *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir.2001), the Court characterized the exception as follows:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Accord Baxter v. Baxter*, 423 F.3d 363, 373 (3rd Cir.2005).

■ In the case at bar, Respondent has provided some evidence, based on Dr. Firpi's evaluation, that Alonso will suffer some psychological harm if he is ordered to return to Colombia.[3] However, Dr. Firpi has opined that this risk of harm is reduced by the close relationship that Alonso has had with his paternal relatives, and the support system he has in Colombia. Significantly, Respondent is in a position to greatly reduce this risk, if she so chooses, by discontinuing the activities which Dr. Firpi believes have resulted in a degree of parental alienation toward Petitioner, and if Respondent returns with the children to Colombia. Although the undersigned has concerns regarding the psychological well-being of Alonso if he is ordered to return, Petitioner has failed to establish by clear and convincing evidence that the risk is sufficiently grave to warrant a denial of return. In this regard, the Court notes that the goals of the Convention would be frustrated if an abducting parent were permitted to thwart a return

---

**3.** There is no credible evidence of a threat of physical harm if the children are ordered to return; and there is no evidence of any psychological harm to the younger children, Julio and Luis.

by causing, or refusing to ameliorate, psychological harm to the child.

Finally, the absence of a grave risk of harm is underscored by the fact that while both parties resided in Colombia, the children spent significant periods of time with their father and grandmother; and this practice continued with respect to their extended visits with their parental family in Miami. Therefore, Respondent has failed to establish this defense.

## IV. *CONCLUSION*

Based upon the foregoing analysis, it is hereby

**RECOMMENDED** that the Petition be **GRANTED**, and that the minor children be ordered to be returned to Colombia.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.), *cert. denied*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993).

June 20, 2006.