RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

LIZ LORENA LOPEZ MORENO,

*Petitioner-Appellant*,

*v.*

JASON MICHAEL ZANK,

*Respondent-Appellee*.

No. 17-2397

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cv-00732—Paul Lewis Maloney, District Judge.

Argued: June 14, 2018

Decided and Filed: July 19, 2018

Before: KEITH, ROGERS, and BUSH, Circuit Judges

─────────────

## COUNSEL

**ARGUED:** Amy Grauman, AVANTI LAW GROUP, PLLC, Wyoming, Michigan, for Appellant. Matthew T. Nelson, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Amy Grauman, Robert Anthony Alvarez, AVANTI LAW GROUP, PLLC, Wyoming, Michigan, for Appellant. Matthew T. Nelson, Peter M. Kulas-Dominguez, Paul H. Beach, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellee.

─────────────

## OPINION

─────────────

ROGERS, Circuit Judge. In this case under the Hague Convention on the Civil Aspects of International Child Abduction, a mother seeks the return of a child to Ecuador, the place

where the child had become accustomed to living, from a stay with the father in the United States that the mother, at least, intended to be temporary. Relief is available under the Convention only if Ecuador is the habitual residence of the child. The district court held that the mother's original abduction of the child to Ecuador years earlier meant that Ecuador could not be the child's habitual residence. However, the father had not followed through with Hague Convention procedures in Ecuador following the original abduction. Reversal is required because the proper remedy for the initial kidnapping to Ecuador was a Hague Convention petition filed in Ecuador, subject to applicable limitations and defenses, rather than the self-help remedy of (in effect) later re-kidnapping back to the United States. A remand is also necessary, on which various treaty-based defenses may be raised.

The child at issue here, BLZ, was born in 2006 in Michigan to the then-married couple of Jason Zank, a citizen of the United States, and Liz Lopez Moreno, a citizen of Ecuador. Zank and Lopez Moreno divorced in July 2009. Their divorce decree granted Zank and Lopez Moreno joint legal and physical custody of BLZ, with alternate weekly custody and twice-weekly visitation by each parent. It also prohibited Lopez Moreno from taking BLZ to Ecuador without prior notice to Zank.

The concerns implicit in the divorce decree turned out to have been well-founded. In December 2009, Lopez Moreno took BLZ to Ecuador with her, in violation of the divorce decree. Zank sought and received a court order from a Michigan state court, the Montcalm County Circuit Court, temporarily granting him sole legal and physical custody of BLZ. Because this proceeding was ex parte, Lopez Moreno was not present during that action.

Once Zank discovered that BLZ had been taken to Ecuador, he contacted the U.S. Department of State and filled out a Hague Convention petition with the United States Embassy in Ecuador. Zank did not complete the Hague Convention process, however, in that he did not file the petition with the Ecuadorian courts, or otherwise attempt to secure the return of BLZ through procedures in Ecuador. Zank testified that he had not filed the petition or pursued any other remedy in Ecuador because he had suffered what he called "the runaround" from U.S. Embassy officials. The district court determined that Zank's testimony was credible, based in part on the fact that the U.S. State Department has in the meantime labeled Ecuador as not being

in compliance with its Hague Convention obligations. The district court, however, did not make any finding that Zank had actually been obstructed by any Ecuadorian officials in his failure to file a Hague petition or that any petition filed by Zank with an Ecuadorian court would ultimately have been futile.

In Ecuador, Lopez Moreno enrolled BLZ in a private school and arranged for her to have language tutoring. BLZ flourished in this environment, participating in a number of extracurricular activities and making many Ecuadorian friends. The district court accordingly determined that, because BLZ had lived so fully in Ecuador from the ages of 3 to 10, she "had been acclimatized to Ecuador and was settled there," such that she would have met the standards for establishing habitual residency in Ecuador.

As Lopez Moreno and BLZ settled into their new Ecuadorian home, tensions between Lopez Moreno and Zank also began to subside. Beginning in 2010, Lopez Moreno first permitted Zank's parents, and then Zank himself, to visit BLZ in Ecuador. Although able to visit BLZ, Zank did not attempt to take BLZ to the United States Embassy, or to pursue a Hague Convention petition in Ecuador during these visits. Zank testified that this apparent lack of effort was because Lopez Moreno required him and his parents to surrender their passports before visiting BLZ.

In 2014, following several of these visits, Lopez Moreno proposed to Zank that they formalize the status of BLZ in Ecuador. In 2010, Lopez Moreno had obtained an ex parte order from an Ecuadorian court prohibiting BLZ from leaving the country, but Zank had not participated in or been a party to that order. Lopez Moreno and Zank therefore began to negotiate, and they ultimately reached an accord between themselves. Under their agreement, Lopez Moreno received full legal custody of BLZ and an increase in Zank's child support payments from $200 to $300 a month, and Zank "waive[d] pursuing further action arising from the arrival of the minor child in Ecuador." In return for his concessions, Zank received a lifting of the 2010 Ecuadorian court order, and Lopez Moreno's permission to have BLZ visit him in Michigan when not in school in Ecuador.

Lopez Moreno and Zank tell conflicting stories about how they came to reach this agreement. In Lopez Moreno's telling, she decided to resolve her disagreements with Zank after recognizing the harm that the dispute caused to BLZ. In Zank's telling, Lopez Moreno presented him with an ultimatum: agree to her demands or be permanently cut off from BLZ. The district court credited Zank's account over that of Lopez Moreno, as evidenced by the one-sidedness of the agreement towards Lopez Moreno. The court also made a specific determination that Zank "was coerced into making the agreement."

Zank and Lopez Moreno brought the agreement to an Ecuadorian family court for ratification. The Ecuadorian court approved and ratified the agreement, granting permanent custody of BLZ to Lopez Moreno in Ecuador, but permitting BLZ to make temporary visits to Zank in the United States. The district court below noted that the Ecuadorian court was apparently not apprised of the background of the case, including the fact that Lopez Moreno had taken BLZ to Ecuador in violation of the Michigan state court order, or that Zank had attempted (though ultimately failed) to file a petition under the Hague Convention.

Following the Ecuadorian agreement, BLZ made one visit to Zank in Michigan in 2014, without incident. In 2015, before a second visit of BLZ to Zank in Michigan, Lopez Moreno and Zank entered into a second agreement, this one in the United States. This agreement tracked the Ecuadorian agreement: it stipulated that BLZ had "established a life in Ecuador," that primary custody should be awarded to Lopez Moreno, that BLZ would be allowed to visit Zank in Michigan, and that Zank would pay Lopez Moreno the agreed-upon child support. Lopez Moreno and Zank apparently intended to file this agreement with the Montcalm County Circuit Court, the court that had granted Zank temporary custody of BLZ in 2009 and never revoked Zank's custody of BLZ. The lawyer that Lopez Moreno chose to draw up and file the second agreement apparently bungled the matter, however. The agreement was addressed to an uninvolved Michigan court, the Kent County Circuit Court. In addition, as the district court determined, the version of the agreement entered into the record leaves it unclear as to whether the agreement was actually filed with any court.

In 2016, Lopez Moreno again sent BLZ to visit Zank for the summer. This visit did not go as planned. Zank testified that, during this visit, BLZ told him that Lopez Moreno had

physically abused her, by hitting her and throwing a chair at her, and that she did not wish to return to Ecuador. On August 5, 2016, BLZ called Lopez Moreno, and, in a "very fast conversation," BLZ stated that she had learned "the entire truth" about the divorce, believed that Lopez Moreno "was a drug user," and had realized that Lopez Moreno had abducted her to Ecuador. However, BLZ did not explicitly say in this conversation that she would not return to Ecuador. Even so, on August 10, Zank did not place BLZ on a scheduled flight to Florida to visit Walt Disney World with Lopez Moreno's father, and, on August 15, Zank did not place BLZ on a flight scheduled to take BLZ from Michigan back to Ecuador.

On October 10, 2016, Zank filed a petition with the Montcalm County Circuit Court for permanent custody of BLZ. The Friend of the Court investigated Zank's living situation and determined that the best interest of BLZ was for Zank to be granted permanent custody of her, given, among other things, that Lopez Moreno had violated the 2009 custody order and that BLZ voiced a preference for living permanently with Zank. Lopez Moreno was not present in this process, apparently because she had not updated her address with the court when she left for Ecuador. On October 31, 2016, the Montcalm County Circuit Court granted permanent sole custody of BLZ to Zank.

On August 14, 2017, Lopez Moreno filed this Hague Convention petition in U.S. District Court, contending that Zank's retention of BLZ in Michigan was wrongful. The complaint sought the immediate return of BLZ to Ecuador and made the allegation, necessary to relief under the Convention given Lopez Moreno's arguments, that BLZ was a habitual resident of Ecuador. The district court rejected this argument, however. Although the court acknowledged that BLZ had spent such extensive time and maintained such a social connection to Ecuador that she would otherwise be deemed a habitual resident of that nation, it held that "because [Lopez Moreno] abducted BLZ in violation of Michigan law and brought her [to Ecuador] in 2009," she could not have become habitually resident in Ecuador, and that her habitual residence accordingly remained in the United States. The district court proceeded to decide further that, because BLZ maintained habitual residency in the United States, the 2009 custody order continued to apply to BLZ and the subsequent Ecuadorian and American agreements between Lopez Moreno and Zank did not overcome that custody order. The former did not apply because

an Ecuadorian court did not have jurisdiction over an American custody assignment, and the latter did not because there was no evidence that the agreement was ever ratified by the Montcalm County Circuit Court.  Lopez Moreno appeals.

Relief under the Hague Convention, as implemented by the International Child Abduction Remedies Act (ICARA), is available only where there is a "removal or retention of a child . . . in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention."  Hague Convention on the Civil Aspects of International Child Abduction, Art. 3, Oct. 25, 1980, T.I.A.S. No. 11,670.  U.S. law provides for a cause of action for the return of a child where a petitioner establishes that the "child has been wrongfully removed or retained within the meaning of the Convention."  22 U.S.C. § 9003(e)(1).

The central issue in this case is whether *Lopez Moreno's* questionable removal of BLZ from Michigan to Ecuador *in 2009* precluded the possibility that BLZ had become habitually resident in Ecuador for purposes of Lopez Moreno's Hague Convention challenge to *Zank's* retention of BLZ in Michigan *in 2016*.  If the answer is yes, and BLZ was a habitual resident of Michigan in 2016, then Lopez Moreno could get no relief under the Convention,[1] and that is the end of the case because such relief under the Convention is all that her complaint sought.  If the answer is no, and BLZ in 2016 was a habitual resident of Ecuador for Hague Convention purposes, then that conclusion destroys the basis for the remainder of the district court's analysis examining whether Zank's retention of BLZ in 2016 was a breach of United States law.  Accordingly, we do not need to address that latter analysis, and it is sufficient on this appeal for us to resolve only the determinative habitual residence issue.  When reviewing a Hague Convention petition claiming that a child was wrongfully abducted from a previous residence, "a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Friedrich v. Friedrich* (*Friedrich II*), 78 F.3d 1060, 1063 (6th Cir. 1996).

---

[1]Relief under the Convention requires a showing that a removal or retention is contrary to the law of the state of habitual residence, and Lopez Moreno makes no argument that Zank's retention of BLZ violated Michigan law.

The Hague Convention requires the return of a child wrongfully removed or retained contrary to "the law of the State in which the child was habitually resident," Hague Abduction Convention, Art. 3, but the Convention does not itself define the term "habitual residence." We have held that, for children above the age of cognizance, *cf. Ahmed v. Ahmed,* 867 F.3d 682, 689 (6th Cir. 2017), a habitual residence is "the nation where, at the time of [her] removal, the child has been present long enough to allow 'acclimatization,' and where this presence has a 'degree of settled purpose from the child's perspective.'" *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)). Lopez Moreno argues that Ecuador meets that standard here, and so qualifies as BLZ's habitual residence.

The district court found that, by 2016, Ecuador met all requirements to have become BLZ's habitual residence, given that she had lived there continuously since the age of three, and maintained an active social, familial, and academic life in that nation. Zank does not challenge the facts underlying this conclusion, and the assessment is clearly correct. From BLZ's perspective, at the time of Zank's retention of her in the United States, Ecuador was the place in which she possessed all degrees of settled purpose. The only basis for deciding that BLZ was not habitually resident in Ecuador in 2016 is the purported illegality of Lopez Moreno's actions in 2009 in taking BLZ to Ecuador in the first place. But that is not enough to trump the acclimatization standard, at least where Zank failed to pursue all treaty-based remedies in Ecuador to secure BLZ's return to the United States.

The object and purpose of the Hague Convention is to provide an international legal scheme to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Abduction Convention, Preamble. The Convention accordingly seeks to avoid the harms to a child's well-being that come from being torn from the surroundings to which the child has been accustomed. *See id.*; *see also* H.R. Rep. No. 100-525 (1988), at 5, *reprinted in* 1988 U.S.C.C.A.N. 386, 386–87. States party to the Convention therefore undertake to return a wrongfully taken child when proceedings are brought promptly, subject to certain exceptions related to the child's welfare and desires. The Convention also allows a person seeking relief to bring these proceedings without the assistance of State agents by "applying

directly to the judicial or administrative authorities of a Contracting State." Hague Abduction Convention, Art. 29.

Therefore, if Convention procedures are not fully pursued when a child is first abducted, it makes little sense to categorically permit later self-help abduction in the other direction, after the child has been acclimatized in the second country. First, permitting re-abduction results in a total disregard for the limits that the Convention puts on the remedy for the first abduction, such as time limits,[2] and exceptions for the child's welfare or mature preference. Second, permitting abduction for a second time carries the same threat to the child's well-being of being torn from an accustomed residence. The Convention scheme achieves its purposes only if Convention processes are applied, with applicable exceptions, each time a child is abducted from a country in which the child has been acclimatized. The rule applied by the district court in this case is not consistent with such a scheme.

At least two of our sister circuits have come to a similar conclusion. The Eleventh Circuit recently addressed the situation of a child who was born in the United States, was taken by the mother to Guatemala in what the father believed was a wrongful manner, and then was kidnapped back to the United States by the father. *Ovalle v. Perez*, 681 F. App'x 777, 779 (11th Cir. 2017). The *Ovalle* court held that the child's habitual residence was in Guatemala, at least for purposes of the mother's subsequent Hague petition seeking to remedy the re-abduction, given the father's reliance on self-help, and, in part, his "failure to 'pursue his legal remedy' under the Hague Convention." *Id.* at 783 (quoting *Kijowska v. Haines*, 463 F.3d 583, 588–89 (7th Cir. 2006)). In *Kijowska*, the Seventh Circuit provided the following alternative reasoning for its determination that a child brought to Poland and subsequently retained there was a habitual resident of that nation:

> Suppose that [the child]'s habitual residence when her mother took her to Poland in December 2004 was the United States and that [her mother]'s removal of her was wrongful. [The father]'s remedy would have been to file a petition under the Hague Convention and its implementing federal statute. He did not do that. He merely sought a custody order from an Illinois state court and then used that order

---

[2]A petition must be filed within one year of removal, or else significant defenses to a return order apply. *See, e.g., Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1229 (2014) (citing Hague Abduction Convention, Art. 12).

to help obtain the self-help remedy of taking the child from the airport. To give a legal advantage to an abductor who has a perfectly good legal remedy in lieu of abduction yet failed to pursue it would be contrary to the Hague Convention's goal of discouraging abductions by denying to the abductor any legal advantage from the abduction. By failing to pursue his legal remedy, [the father] enabled [the child] to obtain a habitual residence in the country to which her mother took her, even if the initial taking was wrongful. For as we have seen, there is no doubt that if the circumstances in which [the child] was taken to Poland are set to one side, by May 2005 she was indeed a habitual resident of Poland.

*Kijowska*, 463 F.3d at 588–89.

Zank seeks to defend the district court's decision based on a statement in our decision in *Friedrich I*, that a fundamental purpose of the Hague Convention is to "deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1400 (6th Cir. 1993). But *Friedrich I* did not deal with the situation here. We said in *Friedrich I* that "the change in geography must occur before the questionable removal . . . . If we were to determine that by removing [a child] from his habitual residence without [one parent]'s knowledge or consent [the other parent] 'altered' [the child]'s habitual residence, we would render the Convention meaningless." *Id.* at 1402. Here, by contrast, the relevant change in geography clearly preceded the removal or retention being questioned, that is, the subsequent retention by Zank. It is very different to say that in the *absence* of a Hague Convention suit, the non-suing parent can use self-help much later, and be free from suit by the parent who never had the chance to defend against such a previous petition, with whatever defenses might properly have been available then.

The other cases cited by Zank also do not support what the district court did in this case. *See Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001); *Kijowska*, 463 F.3d 588–89; *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 379 (8th Cir. 1995). *Miller*'s statement about the effect of a previous wrongful removal was dicta in light of that case's holding that there was no initial wrongful removal or retention there. *See Miller*, 240 F.3d at 401. *Kijowska*, as noted above, directly supports our analysis. In *Nunez-Escudero*, the Eighth Circuit rejected an argument that habitual residence follows the mother, citing our language in *Friedrich I*. *See Nunez-Escudero*, 58 F.3d at 379 (citing *Friedrich I*, 983 F.2d at 1402).

We do not address the situation where someone in Zank's position actually filed a Hague petition in Ecuador. Here, Zank brought no such case in Ecuador. Zank testified that he meant to file a Hague petition, but did not do so because he encountered what he calls "the runaround" from officials at the U.S. Embassy in Ecuador. Any lack of help by U.S. embassy officials is clearly not enough to say that Zank could not have brought an action in an Ecuadorian court. The record is also not sufficient to overcome our general presumption about the adequacy of remedies available in a country that is party to the Hague Convention. We also do not address the situation where a properly filed Hague petition was denied. But in that situation a U.S. court would presumably at least give that Ecuadorian decision substantial deference. *See Diorinou v. Mezitis*, 237 F.3d 133, 143 (2d Cir. 2001).

This is also not a case that raises the issue of what a U.S. court should do when a treaty partner renounces, or consistently violates, a treaty that is implemented by statute. Although the district court credited a report from the U.S. Department of State indicating that Ecuador has been delinquent in its Hague obligations since 2014, the report says nothing about Ecuador's compliance with the Convention in 2009 or 2010. Such a report does not absolve Zank of his obligation to fully pursue all available Hague Convention procedures in Ecuador, including filing a petition with the Ecuadorian courts.

Our holding that Ecuador was the habitual residence of BLZ in 2016 does not automatically mean that Zank must return her now. Just as Lopez Moreno could have raised defenses to a Hague Convention case had one been brought in Ecuador, Zank can raise such defenses in this case on remand. Several such defenses were raised by Zank in the district court below, but the district court had no occasion to reach them. For instance, Zank contended below that Lopez Moreno had failed to file the petition within the one-year limit following the wrongful retention, because Zank contended that this retention began on August 10, when Zank did not place BLZ on the flight to Florida. If Zank is correct, then under the Convention return to Ecuador would not be required if BLZ had become "settled" in Michigan, because the Hague Convention does not require return after a year if "it is demonstrated that the child is now settled in its new environment." Hague Abduction Convention, Art. 12. In addition, a district court hearing a Hague petition may refuse to return a child otherwise required to be returned if "the

child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (citing Hague Abduction Convention, Art. 13). In this case, BLZ was born in 2006 and may therefore possess the age and maturity to have her views taken into account. We have held that the maturity defense is a case-specific one, and requires specific fact-finding by the trial court as to the ability of the child to form those wishes. *See id.* At oral argument in this appeal, counsel for Lopez Moreno agreed that such arguments could be addressed in the district court should Lopez Moreno succeed in obtaining a remand.

We therefore remand this case to the district court for a first evaluation of Zank's defenses against Lopez Moreno's prima facie Hague Convention case. Such a remand is warranted because these defenses are all fact-intensive ones, generally requiring specific and detailed fact-finding by the district court. *See Friedrich II*, 78 F.3d at 1067.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.